## PACIFIC GAS & ELECTRIC CO. *v.* PUBLIC UTILITIES COMMISSION OF CALIFORNIA ET AL.

No. 84–1044.   Argued October 8, 1985—Decided February 25, 1986

2

POWELL, J., announced the judgment of the Court and delivered an opinion, in which BURGER, C. J., and BRENNAN and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 21.   MARSHALL, J., filed an opinion concurring in the judgment, *post*, p. 21.   REHNQUIST, J., filed a dissenting opinion, in Part I of which WHITE and STEVENS, JJ., joined, *post*, p. 26.   STEVENS, J., filed a dissenting opinion, *post*, p. 35.   BLACKMUN, J., took no part in the consideration or decision of the case.

*Robert L. Harris* argued the cause for appellant. With him on the briefs was *Malcolm H. Furbush*.

*Mark Fogelman* argued the cause for appellees. With him on the brief for appellee Public Utilities Commission of California were *Janice E. Kerr* and *Hector Anninos*. *Jerome B. Falk, Jr., Steven L. Mayer*, and *Frederic D. Woocher* filed a brief for appellees Toward Utility Rate Normalization et al.*

*Briefs of *amici curiae* urging reversal were filed for the American Gas Association by *George H. Lawrence, David J. Muchow, John H. Myler*, and *Carol A. Smoots;* for Bell Atlantic Telephone Companies by *Daniel A. Rezneck* and *Robert A. Levetown;* for Consolidated Edison Co. of New York, Inc., by *Joy Tannian, Peter P. Garam*, and *Bernard L. Sanoff;* for the California Chamber of Commerce by *John R. Reese;* for the Edison Electric Institute by *Robert L. Baum, Peter B. Kelsey, William L. Fang*, and *James H. Byrd;* for the Gas Distributors Information Service by *Paul A. Lenzini;* for the Legal Foundation of America by *David Crump, Jean F. Powers*, and *Bradley Ford Stuebling;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat*, and *Ann Plunkett Sheldon;* for the Mountain States Legal Foundation by *Constance E. Brooks, K. Preston Oade, Jr.*, and *Casey Shpall;* for National Fuel Gas Distribution Corp. et al. by *Stanley W. Widger, Jr., Richard N. George*, and *Thomas C. Hutton;* for Pacific Bell et al. by *Philip B. Kurland, John J. Coffey, Robert V. R. Dalenberg, Margaret deB. Brown, Thomas D. Clarke, Jeffrey E. Jackson*, and *Richard M. Cahill;* for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *John H. Findley;* for Pacific Northwest Bell Telephone Co. et al. by *Robert F. Harrington* and *Thomas H. Nelson;* for Sierra Pacific Power Co. by *Boris H. Lakusta, John Madariaga*, and *James D. Salo;* for the Washington Legal Foundation by *Daniel C. Popeo* and *Paul D. Kamenar;* and for the Wisconsin State Telephone Association et al. by *Robert A. Christensen, Ray J. Riordan, Jr., Philip L. Wettengel, Floyd S. Keene*, and *Renee M. Martin*.

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John Van de Kamp*, Attorney General of California, *Herschel T. Elkins*, Senior Assistant Attorney General, *Michael R. Botwin*, Deputy Attorney General, *Joseph I. Lieberman*, Attorney General of Connecticut, *William B. Gundling*, Assistant Attorney General, *Elliot F. Gerson*, Deputy Attorney General, *Linley E. Pearson*, Attorney General of Indiana, *William E. Daily*, Deputy Attorney General, *William J. Guste, Jr.*, Attorney General of Louisiana, *Kendall L. Vick*, Assistant Attorney General, *Mike Greely*, Attorney General of Montana, *Patricia*

4

JUSTICE POWELL announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE BRENNAN, and JUSTICE O'CONNOR join.

The question in this case is whether the California Public Utilities Commission may require a privately owned utility company to include in its billing envelopes speech of a third party with which the utility disagrees.

*J. Schaeffer*, Assistant Attorney General, *Robert M. Spire*, Attorney General of Nebraska, *John Boehm*, Assistant Attorney General, *Brian McKay*, Attorney General of Nevada, *William E. Isaeff*, Chief Deputy Attorney General, *Paul Bardacke*, Attorney General of New Mexico, *Lacy H. Thornburg*, Attorney General of North Carolina, *Jo Anne Sanford*, Special Deputy Attorney General, *Karen E. Long*, Assistant Attorney General, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Terry L. Adkins*, Assistant Attorney General, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Robert S. Tongren*, Assistant Attorney General, *Arlene Violet*, Attorney General of Rhode Island, *Constance L. Messore*, Special Assistant Attorney General, *Jim Mattox*, Attorney General of Texas, *Larry J. Laurent*, Assistant Attorney General, *Charlie Brown*, Attorney General of West Virginia, and *David L. Grubb*, Deputy Attorney General; for the State of Illinois et al. by *Neil F. Hartigan*, Attorney General, *Jill Wine-Banks*, Solicitor General, *John W. McCaffrey* and *Rosalyn B. Kaplan*, Assistant Attorneys General, *Robert L. Graham* and *Laura A. Kastor*; for the State of Oregon by *Dave Frohnmayer*, Attorney General, *William F. Gary*, Deputy Attorney General, and *James E. Mountain, Jr.*, Solicitor General; for the State of Wisconsin by *Bronson C. La Follette*, Attorney General, and *David T. Flanagan*, Assistant Attorney General; for the National League of Cities et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin*, and *Jonathan B. Sallet*; for the American Federation of Labor and Congress of Industrial Organizations by *Marsha Berzon* and *Laurence Gold*; for the Center for Public Interest Law of the University of San Diego School of Law by *Robert C. Fellmeth*; for the Legal Aid Society of New York City by *Helaine Barnett, John E. Kirklin*, and *Kalman Finkel*; for the National Association of State Utility Consumer Advocates et al. by *William Paul Rodgers, Jr., Steven W. Hamm*, and *Raymon E. Lark, Jr.*; and for the New York Citizens' Utility Board, Inc., et al. by *John Cary Sims* and *Alan B. Morrison*; for the Public Service Commission of New York et al. by *David E. Blabey, Timothy P. Sheehan, Robert Abrams*, Attorney General of New York, and *Peter Bienstock*; for the Telecommunications Research and Action Center et al. by *Andrew J. Schwartzman*; and for the Wisconsin Citizens' Utility Board by *Lee Cullen*.

## I

For the past 62 years, appellant Pacific Gas and Electric Company has distributed a newsletter in its monthly billing envelope. Appellant's newsletter, called *Progress*, reaches over three million customers. It has included political editorials, feature stories on matters of public interest, tips on energy conservation, and straightforward information about utility services and bills. App. to Juris. Statement A–66, A–183 to A–190.[1]

In 1980, appellee Toward Utility Rate Normalization (TURN), an intervenor in a ratemaking proceeding before California's Public Utilities Commission, another appellee,[2] urged the Commission to forbid appellant to use the billing envelopes to distribute political editorials, on the ground that appellant's customers should not bear the expense of appellant's own political speech. *Id.*, at A–2. The Commission decided that the envelope space that appellant had used to disseminate *Progress* is the property of the ratepayers. *Id.*, at A–2 to A–3.[3] This "extra space" was defined as "the

---

[1] For example, the December 1984 issue of *Progress* included a story on appellant's "automatic payment" and "balanced payment" plans, an article instructing ratepayers on how to weatherstrip their homes, recipes for holiday dishes, and a feature on appellant's efforts to help bald eagles in the Pit River area of California. App. to Juris. Statement A–183 to A–190. When the Commission first addressed the question whether appellant could continue to have exclusive access to its billing envelopes, it noted that *Progress* has previously discussed the merits of recently passed and pending legislation in Congress. *Id.*, at A–66.

[2] In addition to TURN and the Commission, there are five other appellees: Consumers Union, Consumer Federation of California, Common Cause of California, California Public Interest Research Group, and California Association of Utility Shareholders. Only TURN claims a direct interest in the outcome of this case; the other appellees appear to be intervenors concerned only with this case's precedential effects.

[3] The Commission summarized its reasoning as follows:

"[E]nvelope and postage costs and any other costs of mailing bills are a necessary part of providing utility service to the customer . . . . However, due to the nature of postal rates . . . extra space exists in these billing envelopes. . . . Mindful that the extra space is an artifact generated with

space remaining in the billing envelope, after inclusion of the monthly bill and any required legal notices, for inclusion of other materials up to such total envelope weight as would not result in any additional postage cost." *Ibid.*

In an effort to apportion this "extra space" between appellant and its customers, the Commission permitted TURN to use the "extra space" four times a year for the next two years. During these months, appellant may use any space not used by TURN, and it may include additional materials if it pays any extra postage. The Commission found that TURN has represented the interests of "a significant group" of appellant's residential customers, *id.*, at A–15, and has aided the Commission in performing its regulatory function, *id.*, at A–49 to A–50. Consequently, the Commission determined that ratepayers would benefit from permitting TURN to use the extra space in the billing envelopes to raise funds and to communicate with ratepayers: "Our goal . . . is to change the present system to one which uses the extra space more efficiently for the ratepayers' benefit. It is reasonable to assume that the ratepayers will benefit more from exposure to a variety of views than they will from only that of PG&E." *Id.*, at A–17. The Commission concluded that appellant could have no interest in excluding TURN's message from the billing envelope since appellant does not own the space that message would fill. *Id.*, at A–23.[4] The Commis-

ratepayer funds, and is not an intended or necessary item of rate base, and that the only alternative treatment would unjustly enrich PG&E and simultaneously deprive the ratepayers of the value of that space, we concluded that the extra space in the billing envelope 'is properly considered as ratepayer property.'" *Id.*, at A–3.

[4] Commissioners Bagley and Calvo dissented from the Commission's decision to grant TURN access to the billing envelopes. Commissioner Bagley argued that the Commission's order had potentially sweeping consequences for various kinds of property interests:

"The face of every utility-owned dam, the side of every building, the surface of every gas holder rising above our cities, and the bumpers of every utility vehicle—to name just a few relevant examples—have 'excess space'

sion placed no limitations on what TURN or appellant could say in the envelope, except that TURN is required to state that its messages are not those of appellant. *Id.*, at A–17 to A–18. The Commission reserved the right to grant other groups access to the envelopes in the future.[5] *Ibid.*

Appellant appealed the Commission's order to the California Supreme Court, arguing that it has a First Amendment right not to help spread a message with which it disagrees, see *Wooley* v. *Maynard*, 430 U. S. 705 (1977), and that the Commission's order infringes that right. The California Supreme Court denied discretionary review. We noted probable jurisdiction, 470 U. S. 1083 (1985), and now reverse.

---

and 'economic advertising value.' Some utility corporations place bumper-strip messages on their vehicles. Buses and trucks regularly carry advertising messages. In the words of the majority at page 23 of the decision, 'It is reasonable to assume that the ratepayers will benefit from exposure to a variety of views. . . .' Is it the postulate of this Commission, flowing from the decision's stated premise . . . that ratepayers would benefit from exposure to some particular socially desirable message from some ratepayer group making use of any or all such areas of excess valuable space?" *Id.*, at A–40.

Commissioner Bagley also argued that the Commission's decision would require the Commission to make forbidden content-based distinctions in order to allocate the extra space among competing speakers. *Id.*, at A–41. Commissioner Calvo contended, first, that the order infringed appellant's First Amendment rights, and, second, that it was unnecessary because "TURN has other opportunities to reach its natural audience." *Id.*, at A–56. Commissioner Calvo noted that the Commission often awarded TURN and similar groups fees for their participation in ratemaking proceedings, funds that presumably could finance separate mailings. *Ibid.*

[5] The Commission has already *denied* access to at least one group based on the content of its speech. The Commission denied the application of a taxpayer group—the Committee of More than One Million Taxpayers to Save Proposition 13—on the ground that that group neither wished to participate in Commission proceedings nor alleged that its use of the billing envelope space would improve consumer participation in those proceedings. *Id.*, at A–157 to A–164. The record does not reveal whether any other groups have sought access to the billing envelopes.

## II

The constitutional guarantee of free speech "serves significant societal interests" wholly apart from the speaker's interest in self-expression. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 776 (1978). By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information. See *Thornhill* v. *Alabama*, 310 U. S. 88, 102 (1940); *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 863–864 (1974) (POWELL, J., dissenting). The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the "discussion, debate, and the dissemination of information and ideas" that the First Amendment seeks to foster. *First National Bank of Boston* v. *Bellotti*, *supra*, at 783 (citations omitted). Thus, in *Bellotti*, we invalidated a state prohibition aimed at speech by corporations that sought to influence the outcome of a state referendum. 435 U. S., at 795. Similarly, in *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 544 (1980), we invalidated a state order prohibiting a privately owned utility company from discussing controversial political issues in its billing envelopes. In both cases, the critical considerations were that the State sought to abridge speech that the First Amendment is designed to protect, and that such prohibitions limited the range of information and ideas to which the public is exposed. *First National Bank of Boston* v. *Bellotti*, *supra*, at 776–778, 781–783; *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, *supra*, at 533–535.

There is no doubt that under these principles appellant's newsletter *Progress* receives the full protection of the First Amendment. *Lovell* v. *Griffin*, 303 U. S. 444, 452 (1938). In appearance no different from a small newspaper, *Progress'* contents range from energy-saving tips to stories about wildlife conservation, and from billing information to recipes. App. to Juris. Statement A–183 to A–190. *Progress* thus

extends well beyond speech that proposes a business trans-
action, see *Zauderer* v. *Office of Disciplinary Counsel*, 471
U. S. 626, 637 (1985); *Central Hudson Gas & Electric Corp.*
v. *Public Service Comm'n of N. Y.*, 447 U. S. 557, 561–563
(1980), and includes the kind of discussion of "matters of pub-
lic concern" that the First Amendment both fully protects
and implicitly encourages. *Thornhill* v. *Alabama, supra,*
at 101.

The Commission recognized as much, but concluded that
requiring appellant to disseminate TURN's views did not in-
fringe upon First Amendment rights. It reasoned that ap-
pellant remains free to mail its own newsletter except for the
four months in which TURN is given access. The Commis-
sion's conclusion necessarily rests on one of two premises: (i)
compelling appellant to grant TURN access to a hitherto pri-
vate forum does not infringe appellant's right to speak; or (ii)
appellant has no property interest in the relevant forum and
therefore has no constitutionally protected right in restrict-
ing access to it. We now examine those propositions.

### III

Compelled access like that ordered in this case both penal-
izes the expression of particular points of view and forces
speakers to alter their speech to conform with an agenda they
do not set. These impermissible effects are not remedied by
the Commission's definition of the relevant property rights.

### A

This Court has previously considered the question whether
compelling a private corporation to provide a forum for views
other than its own may infringe the corporation's freedom of
speech. *Miami Herald Publishing Co.* v. *Tornillo*, 418
U. S. 241 (1974); see also *PruneYard Shopping Center* v.
*Robins*, 447 U. S. 74, 85–88 (1980); *id.*, at 98–100 (POW-
ELL, J., joined by WHITE, J., concurring in part and in judg-
ment). *Tornillo* involved a challenge to Florida's right-of-

reply statute. The Florida law provided that, if a newspaper assailed a candidate's character or record, the candidate could demand that the newspaper print a reply of equal prominence and space. 418 U. S., at 244–245, and n. 2.

We found that the right-of-reply statute directly interfered with the newspaper's right to speak in two ways. *Id.*, at 256. First, the newspaper's expression of a particular viewpoint triggered an obligation to permit other speakers, with whom the newspaper disagreed, to use the newspaper's facilities to spread their own message. The statute purported to advance free discussion, but its effect was to deter newspapers from speaking out in the first instance: by forcing the newspaper to disseminate opponents' views, the statute penalized the newspaper's own expression. We therefore concluded that a "[g]overnment-enforced right of access *inescapably* 'dampens the vigor and limits the variety of public debate.'" *Id.*, at 257 (emphasis added) (quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279 (1963).[6]

Second, we noted that the newspaper's "treatment of public issues and public officials—whether fair or unfair—constitute[s] the exercise of editorial control and judgment." 418 U. S., at 258. Florida's statute interfered with this "editorial control and judgment" by forcing the newspaper to tailor its speech to an opponent's agenda, and to respond to candidates' arguments where the newspaper might prefer to be silent. Cf. *Wooley* v. *Maynard*, 430 U. S., at 714; *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 633–634

---

[6] This Court has sustained a limited government-enforced right of access to broadcast media. *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969). Cf. *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94 (1973). Appellant's billing envelopes do not, however, present the same constraints that justify the result in *Red Lion:* "[A] broadcaster communicates through use of a scarce, publicly owned resource. No person can broadcast without a license, whereas all persons are free to send correspondence to private homes through the mails." *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 543 (1980).

(1943). Since *all* speech inherently involves choices of what to say and what to leave unsaid, this effect was impermissible. As we stated last Term: "'The essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas. . . . There is necessarily . . . a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.'" *Harper & Row Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 524, 559 (1985) (quoting *Estate of Hemingway* v. *Random House,* 23 N. Y. 2d 341, 348, 244 N. E. 2d 250, 255 (1968)) (emphasis in original). See *PruneYard, supra,* at 99–100 (opinion of POWELL, J.).

The concerns that caused us to invalidate the compelled access rule in *Tornillo* apply to appellant as well as to the institutional press.[7] See *First National Bank of Boston* v. *Bellotti,* 435 U. S., at 782–784. Cf. *Lovell* v. *Griffin,* 303 U. S., at 452. Just as the State is not free to "tell a newspaper in advance what it can print and what it cannot," *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 400 (1973) (Stewart, J., dissenting); see also *PruneYard, supra,* at 88, the State is not free either to restrict appellant's speech to certain topics or views or to force appellant to respond to views that others may hold. *Consolidated Edi-*

---

[7] Unlike the right-of-reply statute at issue in *Tornillo,* the Commission's order does not require appellant to place TURN's message in appellant's newsletter. Instead, the Commission ordered appellant to place TURN's message in appellant's envelope four months out of the year. Like the Miami Herald, however, appellant is still required to carry speech with which it disagreed, and might well feel compelled to reply or limit its own speech in response to TURN's.

The Court's opinion in *Tornillo* emphasizes that the right-of-reply statute impermissibly deterred protected speech. 418 U. S., at 256–257. In the last paragraph of the opinion, the Court concluded that an *independent* ground for invalidating the statute was its effect on editors' allocation of scarce newspaper space. *Id.,* at 258. See also *id.,* at 257, n. 22. That discussion in no way suggested that the State was free otherwise to burden the newspaper's speech as long as the actual paper on which the newspaper was printed was not invaded.

*son Co.* v. *Public Service Comm'n of N. Y.,* 447 U. S., at 533–535.   See *PruneYard,* 447 U. S., at 100 (opinion of POW-ELL, J.); *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 241 (1977).   Under *Tornillo* a forced access rule that would accomplish these purposes indirectly is similarly forbidden.

The Court's decision in *PruneYard Shopping Center* v. *Robins, supra,* is not to the contrary.   In *PruneYard,* a shopping center owner sought to deny access to a group of students who wished to hand out pamphlets in the shopping center's common area.   The California Supreme Court held that the students' access was protected by the State Constitution; the shopping center owner argued that this ruling violated *his* First Amendment rights.   This Court held that the shopping center did not have a constitutionally protected right to exclude the pamphleteers from the area open to the public at large.   *Id.,* at 88.   Notably absent from *PruneYard* was any concern that access to this area might affect the shopping center owner's exercise of his own right to speak: the owner did not even allege that he objected to the content of the pamphlets; nor was the access right content based.   *PruneYard* thus does not undercut the proposition that forced associations that burden protected speech are impermissible.[8]

### B

The Commission's order is inconsistent with these principles.   The order does not simply award access to the public at large; rather, it discriminates on the basis of the viewpoints of the selected speakers.   Two of the acknowledged purposes of the access order are to offer the public a greater variety of views in appellant's billing envelope, and to assist

---

[8] In addition, the relevant forum in *PruneYard* was the open area of the shopping center into which the general public was invited.   This area was, almost by definition, peculiarly public in nature.   *PruneYard,* 447 U. S., at 83, 88.   There is no correspondingly public aspect to appellant's billing envelopes.   See *post,* at 22–23 (MARSHALL, J., concurring in judgment).

groups (such as TURN) that challenge appellant in the Commission's ratemaking proceedings in raising funds. App. to Juris. Statement A–16 to A–17. Access to the envelopes thus is not content neutral. The variety of views that the Commission seeks to foster cannot be obtained by including speakers whose speech agrees with appellant's. Similarly, the perceived need to raise funds to finance participation in ratemaking proceedings exists only where the relevant groups represent interests that diverge from appellant's interests. Access is limited to persons or groups — such as TURN—who disagree with appellant's views as expressed in *Progress* and who oppose appellant in Commission proceedings.[9]

Such one-sidedness impermissibly burdens appellant's own expression. *Tornillo* illustrates the point. Access to the newspaper in that case was content based in two senses: (i) it was triggered by a particular category of newspaper speech, and (ii) it was awarded only to those who disagreed with the newspaper's views. The Commission's order is not, in *Tornillo*'s words, a "content-based penalty" in the first sense, because TURN's access to appellant's envelopes is not condi-

---

[9] This is fully borne out by the order that triggered this appeal. TURN, the only entity to receive access to appellant's billing envelope, purports to represent the interest of a group of appellant's customers: residential ratepayers. App. to Juris. Statement A–14. The Commission's opinion plausibly assumes that the interest of residential ratepayers will often conflict with appellant's interest. *Id.*, at A–50.

Nor does the fact that TURN will use the envelopes to make fundraising appeals lessen the burden on appellant's speech. Cf. *post*, at 36–37 (STEVENS, J., dissenting). The Commission has "disavowed any intention of looking at the way that TURN solicits funds," leaving TURN free to "speak and advocate its own position as best it can" in its billing envelope inserts. Tr. Oral Arg. 31–32, 39. Thus, while TURN's advocacy may be aimed at convincing ratepayers to make donations, that goal does not alter the open-ended nature of the access awarded in this case, because it does not restrict the scope or content of TURN's message. Cf. *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 647 (1981).

tioned on any particular expression by appellant. Cf. *Tornillo*, 418 U. S., at 256. But because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced—at TURN's discretion—to help disseminate hostile views. Appellant "might well conclude" that, under these circumstances, "the safe course is to avoid controversy," thereby reducing the free flow of information and ideas that the First Amendment seeks to promote. *Id.*, at 257.

Appellant does not, of course, have the right to be free from vigorous debate. But it *does* have the right to be free from government restrictions that abridge its own rights in order to "enhance the relative voice" of its opponents. *Buckley* v. *Valeo*, 424 U. S. 1, 49, and n. 55 (1976). The Commission's order requires *appellant* to assist in disseminating *TURN*'s views; it does not equally constrain both sides of the debate about utility regulation.[10] This kind of favoritism goes well beyond the fundamentally content-

---

[10] JUSTICE STEVENS analogizes this aspect of the Commission's order to Securities and Exchange Commission regulations that require management to transmit proposals of minority shareholders in shareholder mailings. *Post*, at 39–40. The analogy is inappropriate. The regulations JUSTICE STEVENS cites differ from the Commission's order in two important ways. First, they allocate shareholder property between management and certain groups of shareholders. Management has no interest in corporate property except such interest as derives from the shareholders; therefore, regulations that limit management's ability to exclude some shareholders' views from corporate communications do not infringe corporate First Amendment rights. Second, the regulations govern speech by a corporation *to itself*. *Bellotti* and *Consolidated Edison* establish that the Constitution protects corporations' right to speak to the public based on the informational value of corporate speech. *Supra*, at 8. Rules that define how corporations govern themselves do not limit the range of information that the corporation may contribute to the public debate. The Commission's order, by contrast, burdens appellant's right freely to speak to the public at large.

neutral subsidies that we sustained in *Buckley* and in *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983). See *Buckley, supra* at 97–105 (sustaining funding of general election campaign expenses of major party candidates); *Regan, supra,* at 546–550 (sustaining tax deduction for contributors to veterans' organizations). Unlike these permissible government subsidies of speech, the Commission's order identifies a favored speaker "based on the identity of the interests that [the speaker] may represent," *First National Bank of Boston* v. *Bellotti*, 435 U. S., at 784, and forces the speaker's opponent — not the taxpaying public — to assist in disseminating the speaker's message. Such a requirement necessarily burdens the expression of the disfavored speaker.

The Commission's access order also impermissibly requires appellant to associate with speech with which appellant may disagree. The order on its face leaves TURN free to use the billing envelopes to discuss any issues it chooses.[11] Should TURN choose, for example, to urge appellant's customers to vote for a particular slate of legislative candidates, or to argue in favor of legislation that could seriously affect the utility business, appellant may be forced either to appear to agree with TURN's views or to respond. *PruneYard*, 447 U. S., at 98–100 (opinion of POWELL, J.).[12] This pressure to

---

[11] The presence of a disclaimer on TURN's messages, see *supra,* at 7, does not suffice to eliminate the impermissible pressure on appellant to respond to TURN's speech. The disclaimer serves only to avoid giving readers the mistaken impression that TURN's words are really those of appellant. *PruneYard*, 447 U. S., at 99 (opinion of POWELL, J.). It does nothing to reduce the risk that appellant will be forced to respond when there is strong disagreement with the substance of TURN's message. *Ibid.*

[12] The Commission's order is thus readily distinguishable from orders requiring appellant to carry various legal notices, such as notices of upcoming Commission proceedings or of changes in the way rates are calculated. The State, of course, has substantial leeway in determining appropriate information disclosure requirements for business corporations. See

respond "is particularly apparent when the owner has taken a position opposed to the view being expressed on his property." *Id.*, at 100. Especially since TURN has been given access in part to create a multiplicity of views in the envelopes, there can be little doubt that appellant will feel compelled to respond to arguments and allegations made by TURN in its messages to appellant's customers.

That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster. *Harper & Row*, 471 U. S., at 559. See also *Wooley* v. *Maynard*, 430 U. S., at 714.[13] For corporations as for individuals, the choice to speak includes within it the choice of what not to say. *Tornillo, supra*, at 258. And we have held that speech does not lose its protection because of the corporate identity of the speaker. *Bellotti, supra*, at 777; *Consolidated Edison*, 447 U. S., at 533. Were the government freely able to compel corporate speakers to propound political messages with which they disagree, this protection would be empty, for the government could require speakers to affirm in one breath that which they deny in the next. It is therefore incorrect to say, as do appellees, that our decisions do not limit the government's authority to compel speech by corporations. The danger that appellant will be required to alter its own message as a consequence of the government's coercive action is a proper object of First Amendment solicitude, because the message itself is protected under our decisions in *Bellotti* and *Consolidated Edison*. Where, as in this case, the danger is one that arises from a content-based grant

---

*Zauderer* v. *Office of Disciplinary Counsel*, 471 U. S. 626, 651 (1985). Nothing in *Zauderer* suggests, however, that the State is equally free to require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation's views.

[13] As we stated in *Wooley*, "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." 430 U. S., at 714.

of access to private property, it is a danger that the government may not impose absent a compelling interest.

## C

The Commission has emphasized that appellant's customers own the "extra space" in the billing envelopes. App. to Juris. Statement A–64 to A–66. According to appellees, it follows that appellant cannot have a constitutionally protected interest in restricting access to the envelopes. This argument misperceives both the relevant property rights and the nature of the State's First Amendment violation.[14]

The Commission expressly declined to hold that under California law appellant's customers own the entire billing envelopes and everything contained therein. *Id.*, at A–2 to A–3. It decided only that the ratepayers own the "extra space" in the envelope, defined as that space left over after including the bill and required notices, up to a weight of one ounce. *Ibid.* The envelopes themselves, the bills, and *Progress* all remain appellant's property. The Commission's access order thus clearly requires appellant to use *its* property as a vehicle for spreading a message with which it disagrees. In *Wooley* v. *Maynard,* we held that New Hampshire could not require two citizens to display a slogan on their license plates and thereby "use their private property as a 'mobile billboard' for the State's ideological message." 430 U. S., at 715. The "private property" that was used to spread the unwelcome message was the automobile, not the license plates. Similarly, the Commission's order requires appellant to use its property—the billing envelopes—to dis-

---

[14] Appellees also argue that appellant's status as a regulated utility company lessens its right to be free from state regulation that burdens its speech. We have previously rejected this argument. *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.,* 447 U. S., at 534, n. 1 ("Consolidated Edison's position as a regulated monopoly does not decrease the informative value of its opinions on critical public matters"). See also *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of N. Y.,* 447 U. S. 557, 566–568 (1980).

tribute the message of another. This is so whoever is deemed to own the "extra space."

A different conclusion would necessarily imply that our decision in *Tornillo* rested on the Miami Herald's ownership of the space that would have been used to print candidate replies. Nothing in *Tornillo* suggests that the result would have been different had the Florida Supreme Court decided that the newspaper space needed to print candidates' replies was the property of the newspaper's readers, or had the court ordered the Miami Herald to distribute inserts owned and prepared by the candidates together with its newspapers. The constitutional difficulty with the right-of-reply statute was that it required the newspaper to disseminate a message with which the newspaper disagreed. This difficulty did not depend on whether the particular paper on which the replies were printed belonged to the newspaper or to the candidate.

Appellees' argument suffers from the same constitutional defect. The Commission's order forces appellant to disseminate TURN's speech in envelopes that appellant owns and that bear appellant's return address. Such forced association with potentially hostile views burdens the expression of views different from TURN's and risks forcing appellant to speak where it would prefer to remain silent. Those effects do not depend on who "owns" the "extra space." [15]

---

[15] As the dissenting Commissioners correctly noted, see n. 4, *supra*, appellees' argument logically implies that the State may compel appellant or any other regulated business to use many different kinds of property to advance views with which the business disagrees. "Extra space" exists not only in billing envelopes but also on billboards, bulletin boards, and sides of buildings and motor vehicles. Under the Commission's reasoning, a State could force business proprietors of such items to use the space for the dissemination of speech the proprietor opposes. At least where access to such fora is granted on the basis of the speakers' viewpoints, the public's ownership of the "extra space" does not nullify the First Amendment rights of the owner of the property from which that space derives.

## IV

Notwithstanding that it burdens protected speech, the Commission's order could be valid if it were a narrowly tailored means of serving a compelling state interest. *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S., at 535; *First National Bank of Boston* v. *Bellotti*, 435 U. S., at 786. Appellees argue that the access order does in fact further compelling state interests. In the alternative, appellees argue that the order is a permissible time, place, or manner restriction. We consider these arguments in turn.

## A

Appellees identify two assertedly compelling state interests that the access order is said to advance. First, appellees argue that the order furthers the State's interest in effective ratemaking proceedings. TURN has been a regular participant in those proceedings, and the Commission found that TURN has aided the Commission in performing its regulatory task. Appellees argue that the access order permits TURN to continue to help the Commission by assisting TURN in raising funds from the ratepayers whose interest TURN seeks to serve.

The State's interest in fair and effective utility regulation may be compelling. The difficulty with appellees' argument is that the State can serve that interest through means that would not violate appellant's First Amendment rights, such as awarding costs and fees.[16] The State's interest may justify imposing on appellant the reasonable expenses of responsible groups that represent the public interest at ratemaking proceedings. But "we find 'no substantially relevant correlation between the governmental interest asserted and the State's effort'" to compel appellant to distribute TURN's speech in appellant's envelopes. *First National Bank of*

---

[16] Indeed, the Commission already does this. See n. 4, *supra* (discussing Commissioner Calvo's dissent).

*Boston* v. *Bellotti, supra,* at 795 (quoting *Shelton* v. *Tucker,* 364 U. S. 479, 485 (1960)).

Second, appellees argue that the order furthers the State's interest in promoting speech by making a variety of views available to appellant's customers. Cf. *Buckley* v. *Valeo,* 424 U. S., at 92–93, and n. 127. We have noted above that this interest is not furthered by an order that is not content neutral. Moreover, the means chosen to advance variety tend to inhibit expression of appellant's views in order to promote TURN's. Our cases establish that the State cannot advance some points of view by burdening the expression of others. *First National Bank of Boston* v. *Bellotti, supra,* at 785–786; *Buckley* v. *Valeo, supra,* at 48–49. It follows that the Commission's order is not a narrowly tailored means of furthering this interest.

## B

Appellees argue, finally, that the Commission's order is a permissible time, place, or manner regulation, since it "serve[s] a significant governmental interest and leave[s] ample alternative channels for communication." *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y., supra,* at 535; see also *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 771 (1976). For a time, place, or manner regulation to be valid, it must be neutral as to the content of the speech to be regulated. *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984); see also *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 210–212 (1975). As we have shown, the State's asserted interest in exposing appellant's customers to a variety of viewpoints is not—and does not purport to be— content neutral.

## V

We conclude that the Commission's order impermissibly burdens appellant's First Amendment rights because it forces appellant to associate with the views of other speakers, and because it selects the other speakers on the basis of

their viewpoints. The order is not a narrowly tailored means of furthering a compelling state interest, and it is not a valid time, place, or manner regulation.

For these reasons, the decision of the California Public Utilities Commission must be vacated. The case is remanded to the California Supreme Court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN took no part in the consideration or decision of this case.

CHIEF JUSTICE BURGER, concurring.

I join JUSTICE POWELL's opinion, but think we need not go beyond the authority of *Wooley* v. *Maynard,* 430 U. S. 705 (1977), to decide this case. I would not go beyond the central question presented by this case, which is the infringement of Pacific's right to be free from forced association with views with which it disagrees. I would also rely on that part of *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), holding that a forced right of reply violates a newspaper's right to be free from forced dissemination of views it would not voluntarily disseminate, just as we held that Maynard must be free from being forced by the State to disseminate views with which he disagreed. To compel Pacific to mail messages for others cannot be distinguished from compelling it to carry the messages of others on its trucks, its buildings, or other property used in the conduct of its business. For purposes of this case, those properties cannot be distinguished from property like the mailing envelopes acquired by Pacific from its income and resources.

JUSTICE MARSHALL, concurring in the judgment.

In *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980), we held that a State could, consistently with the Federal Constitution, prohibit the private owner of a shopping center from using state trespass law to exclude peaceful ex-

pressive activity in the open areas of the shopping center. Concurring in *PruneYard*, I viewed the State's abrogation of the property owner's traditional right to exclude as raising the question of how the Federal Constitution limits a State's ability to redefine its common-law property rights. See *id.*, at 92–93 (MARSHALL, J., concurring). Today we face a similar question. In the present case, California has taken from appellant the right to deny access to its property—its billing envelope—to a group that wishes to use that envelope for expressive purposes. Two significant differences between the State's grant of access in this case and the grant of access in *PruneYard* lead me to find a constitutional barrier here that I did not find in the earlier case.

The first difference is the degree of intrusiveness of the permitted access. We noted in *PruneYard:* "[T]he shopping center by choice of its owner is not limited to the personal use of [its owner]. It is instead a business establishment that is open to the public to come and go as they please." *Id.*, at 87. The challenged rule did not permit a markedly greater intrusion onto the property than that which the owner had voluntarily encouraged, nor did it impair the commercial value of the property. *Id.*, at 83; see also *id.*, at 94 (MARSHALL, J., concurring).

In the present case, by contrast, appellant has never opened up its billing envelope to the use of the public.[1] Ap-

---

[1] The State seizes upon appellant's status as a regulated monopoly in order to argue that the inclusion of postage and other billing costs in the utility's rate base demonstrates that these items "belong" to the public, which has paid for them. However, a consumer who purchases food in a grocery store is "paying" for the store's rent, heat, electricity, wages, etc., but no one would seriously argue that the consumer thereby acquires a property interest in the store. That the utility passes on its overhead costs to ratepayers at a rate fixed by law rather than the market cannot affect the utility's ownership of its property, nor its right to use that property for expressive purposes, see *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 534, n. 1 (1980). The State could have concluded that the public interest would be best served by state own-

pellant has not abandoned its right to exclude others from its property to the degree that the shopping center owner had done in *PruneYard*. Were appellant to use its billing envelope as a sort of community billboard, regularly carrying the messages of third parties, its desire to exclude a particular speaker would be deserving of lesser solicitude. As matters stand, however, appellant has issued no invitation to the general public to use its billing envelope for speech or for any other purpose.[2] Moreover, the shopping center in *PruneYard* bore a strong resemblance to the streets and parks that are traditional public forums. People routinely gathered there, at the owner's invitation, and engaged in a wide variety of activities. Adding speech to the list of those activities did not in any great way change the complexion of the property. The same is not true in this case.

The second difference between this case and *PruneYard* is that the State has chosen to give TURN a right to speak at the expense of appellant's ability to use the property in ques-

---

ership of utilities. Having chosen to keep utilities in private hands, however, the State may not arbitrarily appropriate property for the use of third parties by stating that the public has "paid" for the property by paying utility bills.

I hasten to add that nothing in this opinion nor, as I understand it, the plurality's opinion, addresses the issue whether the State may exclude the cost of mailing *Progress* from appellant's rate base. See *id.*, at 544 (MARSHALL, J., concurring). Indeed, appellant concedes that the State may force its shareholders to bear those costs.

[2] The State also argues that it frequently requires appellant to carry messages concerning utility ratemaking and the rights of utility consumers. These messages, however, do not include political speech, and are directly relevant to commercial transactions between the ratepayer and the utility. The State's interest in requiring appellant to carry such messages is therefore particularly compelling. Cf. *infra*, at 24–25. Somewhat analogously, the State could not argue that, because it may demand access for the State's agents to a private home to monitor compliance with health or safety regulations, see *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), it may also grant access to third parties for nongovernmental purposes.

tion as a forum for the exercise of its own First Amendment rights. While the shopping center owner in *PruneYard* wished to be free of unwanted expression, he nowhere alleged that his own expression was hindered in the slightest. In contrast, the present case involves a forum of inherently limited scope. By appropriating, four times a year, the space in appellant's envelope that appellant would otherwise use for its own speech, the State has necessarily curtailed appellant's use of its own forum. The regulation in this case, therefore, goes beyond a mere infringement of appellant's desire to remain silent, see *post*, at 32–35 (REHNQUIST, J., dissenting).

While the interference with appellant's speech is, concededly, very slight, the State's justification—the subsidization of another speaker chosen by the State—is insufficient to sustain even that minor burden. We have held that the State may use its own resources for subsidization, *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983), but that interest, standing alone, cannot justify interference with the speech of others. See *Buckley* v. *Valeo*, 424 U. S. 1, 48–49 (1976) *(per curiam); First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 790–792 (1978).[3] In the

---

[3] JUSTICE REHNQUIST's dissent argues that a State may freely affect the mix of information available to the public, so long as it only "indirectly and remotely" affects a particular speaker's contribution to that mix. See *post*, at 27. Even if I were to accept that proposition, I disagree with its application to this case.

While the interference with appellant's speech is small, it is by no means indirect. TURN clearly has the first claim to the "extra space" during four months out of every year. Appellant may use its own—and physically limited—forum during those months only to the extent TURN chooses not to use it. This infringement differs from the limitation on campaign contributions in *Buckley* v. *Valeo* because the speech element of a contribution—the message of support for a candidate—was only indirectly related to the size of the contribution. 424 U. S., at 21. By definition, then, a limit on the size of contributions affected speech only indirectly. *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983), is likewise distinguishable. That case decided only that the

instant case, the only state interest identified by appellees is ensuring that ratepayers are "expos[ed] to a variety of views," App. to Juris. Statement A–17, in order to provide "the most complete understanding possible of energy-related issues," *id.*, at A–22. This is no different from the interest that we found insufficient to justify restraints on individual political expenditures in *Buckley* v. *Valeo, supra.* Even assuming that the State could assert a more compelling interest in, for example, curbing actual abuses of the ratemaking process, it has never demonstrated that its regulation is tailored to serve such an interest. Indeed, it disclaims any duty to make that showing, based on its conclusion that ratepayers "own" the extra space. See App. to Juris. Statement A–22. The regulation at issue here, therefore, differs significantly from the Securities and Exchange Commission proxy regulation cited by JUSTICE STEVENS, *post*, at 39.

In *PruneYard*, I recognized that the State may generally create or abrogate rights " 'to attain a permissible legislative object.' " 447 U. S., at 92 (quoting *Silver* v. *Silver*, 280 U. S. 117, 122 (1929)). In the present case, the State has redefined a property right in the extra space in appellant's billing envelope in such a way as to achieve a result—burdening the speech of one party in order to enhance the speech of another—that the First Amendment disallows. In doing so, moreover, it has sanctioned an intrusion onto appellant's property that exceeds the slight incursion permitted in *PruneYard.* Under these circumstances, I believe that the State has crossed the boundary between constitutionally permissible and impermissible redefinitions of private property.

In reaching this conclusion, I do not mean to suggest that I would hold, contrary to our precedents, that the corporation's First Amendment rights are coextensive with those of individuals, or that commercial speech enjoys the same pro-

---

Government could use its own funds to subsidize a preferred speaker. That subsidization caused *no* interference with anyone else's speech, much less indirect and remote interference.

tections as individual speech. In essentially all instances, the use of business property to carry out transactions with the general public will permit the State to restrict or mandate speech in order to prevent deception or otherwise protect the public's health and welfare. In many instances, such as in *PruneYard*, business property will be open to the public to such an extent that the public's expressive activities will not interfere with the owner's use of property to a degree that offends the Constitution. The regulation at issue in this case, I believe, falls on the other side of the line. Accordingly, I join the Court's judgment.

JUSTICE REHNQUIST, with whom JUSTICE WHITE and JUSTICE STEVENS join as to Part I, dissenting.

The plurality concludes that a state-created, limited right of access to the extra space in a utility's billing envelopes unconstitutionally burdens the utility's right to speak if the utility has used the space itself to express political views to its customers. This is so even though the extra envelope space belongs to the customers as a matter of state property law. The plurality justifies its conclusion on grounds that the right of access may (1) deter the utility from saying things that might trigger an adverse response, or (2) induce it to respond to subjects about which it might prefer to remain silent, in violation of the principles established in *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974), and *Wooley* v. *Maynard*, 430 U. S. 705 (1977). I do not believe that the right of access here will have any noticeable deterrent effect. Nor do I believe that negative free speech rights, applicable to individuals and perhaps the print media, should be extended to corporations generally. I believe that the right of access here is constitutionally indistinguishable from the right of access approved in *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), and therefore I dissent.[1]

---

[1] This case does not involve the question whether the First Amendment provides a right of access to a private forum. See *Hudgens* v. *NLRB*, 424

# I

This Court established in *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765 (1978), that the First Amendment prohibits the government from *directly* suppressing the affirmative speech of corporations. A newspaper publishing corporation's right to express itself freely is also implicated by governmental action that penalizes speech, see *Miami Herald Publishing Co.* v. *Tornillo, supra,* because the deterrent effect of a penalty is very much like direct suppression. Our cases cannot be squared, however, with the view that the First Amendment prohibits governmental action that only *indirectly* and *remotely* affects a speaker's contribution to the overall mix of information available to society.

Several cases illustrate this point. In *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam),* the Court upheld limits on political campaign contributions despite the argument that their likely effect would be "to mute the voices of affluent persons and groups in the election process and thereby to equalize the relative ability of all citizens to affect the outcome of elections." *Id.,* at 25–26. The Court explained that the potential effect on affluent speech of limiting access to this one forum was constitutionally insignificant because of the availability of other forums, *id.,* at 26, n. 26, and that the limitation protected the integrity of our representative democracy by limiting political *quid pro quos* and the appearance of corruption, *id.,* at 26–27. The Court also upheld a provision granting different levels of subsidies for Presidential campaigns depending upon whether the party receiving the subsidy is a major, minor, or new party. *Id.,* at 87–88. The Court reasoned that the effect of the provision was "not

U. S. 507 (1976); *Marsh* v. *Alabama,* 326 U. S. 501 (1946). The right of access in this case was granted by state law. See *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); cf. *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367 (1969).

to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion." *Id.*, at 92–93. Similarly, in *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983), the Court upheld a governmental decision to grant a subsidy to certain expressive groups yet deny it to others, depending on whether the groups served the statutory definition of public interest, even though this had the undeniable effect of enhancing the speech of some groups over the speech of others. The Court explained that Congress is free to subsidize some but not all speech. *Id.*, at 548.

*PruneYard Shopping Center* v. *Robins, supra,* illustrates the point in a case that is very similar to the one decided today. The State of California interpreted its own Constitution to afford a right of access to private shopping centers for the reasonable exercise of speech and petitioning. *Id.*, at 78. While acknowledging that the First Amendment does not itself grant a right of access to private forums, *id.*, at 80–81, the Court upheld the state-created right against a First Amendment challenge. See *id.*, at 85–88. It reasoned that *Wooley* v. *Maynard, supra,* does not prohibit such a right of access because the views of those taking advantage of the right would not likely be identified with those of the owners, the State was not dictating any specific message, and the owners were free to disavow any connection to the message by posting disclaimers. 447 U. S., at 87. The Court similarly distinguished *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624 (1943), stating that the right of access did not compel the owners to affirm their belief in government orthodoxy, and left them free to publicly dissociate themselves from the views of the speakers. 447 U. S., at 87–88. Finally, it distinguished *Miami Herald Publishing Co.* v. *Tornillo, supra,* on the ground that the right of access did not constitute a content-based penalty that would "'dampe[n] the vigor and limi[t] the variety of public debate.'" 447 U. S., at 88, quoting *Tornillo, supra*, at 257.

Of course, the First Amendment does prohibit governmental action affecting the mix of information available to the public if the effect of the action approximates that of direct content-based suppression of speech. Thus, while the Court in *Buckley* v. *Valeo, supra,* upheld limits on campaign contributions and allowed disparate governmental subsidies to various political parties, it struck down limitations on campaign expenditures because such limits "impose far greater restraints on the freedom of speech and association." *Id.,* at 44.[2] The Court reasoned that the Government's interest in equalizing the relative influence of individuals over election outcomes could not overcome the First Amendment, which was designed to encourage the widest dissemination of diverse views. *Id.,* at 44–45. Similarly, the Court suggested in *Regan* v. *Taxation With Representation of Washington, supra,* that governmental subsidies aimed at the suppression of dangerous ideas might not pass constitutional muster. *Id.,* at 550.

*Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), held that a governmentally imposed "penalty" for the exercise of protected speech is sufficiently like direct suppression to trigger heightened First Amendment scrutiny. The Court in *Tornillo* struck down a statute granting political candidates a right to reply any time a private newspaper

---

[2] This was the critical distinction between the contribution and expenditure limitations, and not the relative worth of the respective governmental interests. The Court in *Buckley* v. *Valeo* never suggested that the interest served by the campaign limitation provision was a "compelling" one, nor examined the provision to determine whether it was sufficiently tailored to the interest to survive "heightened scrutiny." The Court was satisfied that the provision had only an indirect and minimal effect on First Amendment interests, as well as a rational basis. Nor did the Court treat the expenditure limitations differently because the governmental justification was less important. Instead, the relatively greater effect of these limitations on affirmative speech triggered heightened scrutiny, and a rational basis was no longer sufficient to justify them. See *Buckley,* 424 U. S., at 44–45.

criticized them. See *id.*, at 244. The Court reasoned that the statute violated the First Amendment because it "exact[ed] a penalty on the basis of the content of a newspaper," *id.*, at 256, that would likely have the effect of "'dampe[ning] the vigor and limi[ting] the variety of public debate.'" *Id.*, at 257, quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279 (1964).

Although the plurality draws its deterrence rationale from *Tornillo*, it does not even attempt to characterize the right of access as a "penalty"; indeed, such a Procrustean effort would be doomed to failure. Instead, the plurality stretches *Tornillo* to stand for the general proposition that the First Amendment prohibits any regulation that deters a corporation from engaging in some expressive behavior. But the deterrent effect of any statute is an empirical question of degree. When the potential deterrent effect of a particular state law is remote and speculative, the law simply is not subject to heightened First Amendment scrutiny. See *supra*, at 27–29, and n. 2. The plurality does not adequately explain how the potential deterrent effect of the right of access here is sufficiently immediate and direct to warrant strict scrutiny. While a statutory penalty, like the right-of-reply statute in *Tornillo*, may sufficiently deter speech to trigger such heightened First Amendment scrutiny, the right of access here will not have such an effect on PG&E's incentives to speak.

The record does not support the inference that PUC issued its order to penalize PG&E because of the content of its inserts or because PG&E included the inserts in its billing envelopes in the first place. The order does not prevent PG&E from using the billing envelopes in the future to distribute inserts whenever it wishes. Nor does its vitality depend on whether PG&E includes inserts in any future billing envelopes. Moreover, the central reason for the access order—to provide for an effective ratepayer voice—would not vary in importance if PG&E had never distributed the inserts or

ceased distributing them tomorrow. The most that can be said about the connection between the inserts and the order is that the existence of the inserts quite probably brought to TURN's attention the possibility of requesting access.

Nor does the access order create any cognizable risk of deterring PG&E from expressing its views in the most candid fashion. Unlike the reply statute in *Tornillo*, which conditioned access upon discrete instances of certain expression, the right of access here bears no relationship to PG&E's future conduct. PG&E cannot prevent the access by remaining silent or avoiding discussion of controversial subjects. The plurality suggests, however, that the possibility of minimizing the undesirable content of TURN's speech may induce PG&E to adopt a strategy of avoiding certain topics in hopes that TURN will not think to address them on its own. But this is an extremely implausible prediction. The success of such a strategy would depend on any group given access being little more than a reactive organization. TURN or any other group eventually given access will likely address the controversial subjects in spite of PG&E's silence. I therefore believe that PG&E will have no incentive to adopt the conservative strategy. Accordingly, the right of access should not be held to trigger heightened First Amendment scrutiny on the ground that it somehow might deter PG&E's right to speak.

## II

The plurality argues, however, that the right of access also implicates PG&E's right not to speak or to associate with the speech of others, thereby triggering heightened scrutiny. The thrust of the plurality's argument is that if TURN has access to the envelopes, its speech will have the effect of *forcing* PG&E to address topics about which it would prefer to remain silent. The plausibility of any such prediction depends upon the perceived ineffectiveness of a disclaimer or the absence of any effective alternative means for consumer groups like TURN to communicate to the ratepayers. In

*PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), this Court held that the availability of an effective disclaimer was sufficient to eliminate any infringement upon negative free speech rights. *Id.*, at 87–88. If an alternative forum of communication exists, TURN or the other consumer groups will be able to *induce* PG&E to address the additional topics anyway. Finally, because PG&E retains complete editorial freedom over the content of its inserts, the effect of the right of access is likely to be qualitatively different from a direct prescription by the government of "what shall be orthodox in . . . matters of opinion." *West Virginia Board of Education* v. *Barnette*, 319 U. S., at 642.

There is, however, a more fundamental flaw in the plurality's analysis. This Court has recognized that natural persons enjoy negative free speech rights because of their interest in self-expression; an individual's right not to speak or to associate with the speech of others is a component of the broader constitutional interest of natural persons in freedom of conscience. Thus, in *Barnette, supra,* this Court struck down a compulsory flag salute statute to protect "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.*, at 642. Similarly, in *Wooley* v. *Maynard*, 430 U. S. 705 (1977), the Court invalidated a statute requiring an official slogan to be displayed on all license plates to protect the individual interest in "freedom of mind." *Id.*, at 714. See also *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 234–235 (1977). Most recently, in *Harper & Row Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 524 (1985), this Court rejected a public figure exception to the copyright law, reasoning that the protection of an author's profit incentive furthers rather than inhibits expression, *id.*, at 555–559, and that an author has a countervailing First Amendment interest in *"freedom of thought* and expression [that] 'includes both the right to speak freely and the right to refrain from

speaking at all.'" *Id.*, at 559 (emphasis added), quoting *Wooley* v. *Maynard, supra,* at 714.

In *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), the Court extended negative free speech rights to newspapers without much discussion. The Court stated that the right-of-reply statute not only deterred affirmative speech, but also "fail[ed] to clear the barriers of the First Amendment because of its intrusion into the function of editors." *Id.*, at 258. The Court explained that interference with "the exercise of editorial control and judgment" creates a peril for the liberty of the press like government control over "'what is to go into a newspaper.'" *Ibid.*, and n. 24, quoting 2 Z. Chafee, Government and Mass Communications 633 (1947). The Court did not elaborate further on the justification for its holding.

Extension of the individual freedom of conscience decisions to business corporations strains the rationale of those cases beyond the breaking point. To ascribe to such artificial entities an "intellect" or "mind" for freedom of conscience purposes is to confuse metaphor with reality. Corporations generally have not played the historic role of newspapers as conveyers of individual ideas and opinion. In extending positive free speech rights to corporations, this Court drew a distinction between the First Amendment rights of corporations and those of natural persons. See *First National Bank of Boston* v. *Bellotti,* 435 U. S., at 776; *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.,* 447 U. S. 530, 534–535, and n. 2 (1980). It recognized that corporate free speech rights do not arise because corporations, like individuals, have any interest in self-expression. See *Bellotti, supra,* at 777, and n. 12; *Consolidated Edison, supra,* at 534, n. 2. It held instead that such rights are recognized as an instrumental means of furthering the First Amendment purpose of fostering a broad forum of information to facilitate self-government. See *Bellotti, supra,* at 783; *Consolidated Edison, supra,* at 533.

The interest in remaining isolated from the expressive activity of others, and in declining to communicate at all, is for the most part divorced from this "broad public forum" purpose of the First Amendment. The right of access here constitutes an effort to facilitate and enlarge public discussion; it therefore furthers rather than abridges First Amendment values. See *Harper & Row Publishers, Inc.* v. *Nation Enterprises, supra,* at 558; *Buckley* v. *Valeo,* 424 U. S., at 92–93. In *Zauderer* v. *Office of Disciplinary Counsel,* 471 U. S. 626 (1985), this Court held that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, . . . [the] constitutionally protected interest in *not* providing any particular factual information in [a business'] advertising is minimal." *Id.,* at 651 (citation omitted). Likewise, because the interest on which the constitutional protection of corporate speech rests is the societal interest in receiving information and ideas, the constitutional interest of a corporation in not permitting the presentation of other distinct views clearly identified as those of the speaker is *de minimis.* This is especially true in the case of PG&E, which is after all a regulated public utility. Any claim it may have had to a sphere of corporate autonomy was largely surrendered to extensive regulatory authority when it was granted legal monopoly status.

This argument is bolstered by the fact that the two constitutional liberties most closely analogous to the right to refrain from speaking—the Fifth Amendment right to remain silent and the constitutional right of privacy—have been denied to corporations based on their corporate status. The Court in *Bellotti* recognized that some "'purely personal' guarantees . . . are unavailable to corporations and other organizations," 435 U. S., at 779, n. 14, and therefore declined to hold that "corporations have the full measure of

rights that individuals enjoy under the First Amendment."
*Id.*, at 777.[3]

### III

PG&E is not an individual or a newspaper publisher; it is
a regulated utility. The insistence on treating identically
for constitutional purposes entities that are demonstrably dif-
ferent is as great a jurisprudential sin as treating differently
those entities which are the same. Because I think this case
is governed by *PruneYard*, and not by *Tornillo* or *Wooley*,
I would affirm the judgment of the Supreme Court of
California.

JUSTICE STEVENS, dissenting.

Because the plurality opinion is largely concerned with
questions that need not be answered in order to decide this
case,[1] I believe it is important to identify the actual issue
with some care. The narrow question we must address is
whether a state public utility commission may require the
fundraising solicitation of a consumer advocacy group to be
carried in a utility billing envelope. Since the utility con-
cedes that *it* has no right to use the extra space in the billing
envelope for its own newsletter, the question is limited to
whether the Commission's requirement that it be the courier

---

[3] The extension of negative free speech rights to corporations would cast
doubt upon the result in *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367
(1969), as well as the suggestion in *Hudgens* v. *NLRB*, 424 U. S. 507
(1976), that the Federal Government may grant employees a right of access
to employer property for the purpose of picketing, even though the First
Amendment does not guarantee such access. *Id.*, at 521–523.

[1] For the plurality, the question in this case is whether a public utility
commission "may require a privately owned utility company to include in
its billing envelopes speech of a third party with which the utility dis-
agrees." *Ante*, at 4. The plurality seems concerned that the California
Public Utilities Commission's decision may be the harbinger of future deci-
sions requiring publicly regulated institutions to bear banners antithetical
to their own self-interest. Henceforth, a company's buildings and vehicles
might display signs and stickers proclaiming the benefits of conservation,
lower rates, and perhaps even government ownership. See *ante*, at 6–7,
n. 4.

for the message of a third party violates the First Amendment. In my view, this requirement differs little from regulations applied daily to a variety of commercial communications that have rarely been challenged—and to my knowledge never invalidated—on First Amendment grounds.

## I

As the California Public Utilities Commission summarized its own ruling: "[T]his decision . . . grants, in modified form, the complaint of Toward Utility Rate Normalization (TURN) proposing access to the extra space in Pacific Gas and Electric Company's (PG&E) billing envelope by consumer representative organizations for the purpose of soliciting funds to be used for residential ratepayer representation in proceedings of this Commission involving PG&E." App. to Juris. Statement A–1. Accord, *id.*, at A–4.[2] The Commission did not select among competing advocacy groups yearning to reach residential ratepayers through the billing envelope; "no other ratepayer organizations . . . sought access to the extra space." *Id.*, at A–24.

In my view the propagandizing and sloganeering feared by the plurality is not authorized by paragraph 5(b) of the Commission's order, which provides that "PG&E and TURN shall each determine the content of [its] own material." *Id.*, at A–32. In context, it is clear that the limited editorial license afforded by that provision is confined to "a billing envelope extra space insert . . . which (1) explains the program, (2)

---

[2] The Commission's access order is plainly limited to TURN's fundraising appeal: Subsections (f) through (i) of paragraph 5 of the order, which make provision for funds received in response to TURN's solicitation, make no sense if TURN is not required to solicit funds. See App. to Juris. Statement A–32, A–33.

That the Commission is serious about this limitation is borne out by its denial of access to a group which did not itself wish to participate in Commission proceedings and which failed to allege that its use of the billing envelope would enhance consumer participation in Commission proceedings. See *ante*, at 7, n. 5.

sets forth a list of pending and anticipated PG&E applications and other cases likely to have a significant effect on customers' rates and services, and (3) invites voluntary donations to support advocacy by [TURN] on behalf of PG&E's residential customers before the Commission. The insert would also include a return envelope for mailing donations to a central collection point for transmittal to [TURN]." *Id.*, at A–4, A–5. It is unrealistic to suppose that the Commission, after adopting a program so detailed as to prescribe the subject matter of the communication and even to require return envelopes, can be thought to have sanctioned the freewheeling political debate the plurality opinion presupposes. Far from creating the postal equivalent of the soapbox in the park, the Commission "order[ed] that proposal 3" of the "Consumer Advocacy Checkoff" alternatives listed in TURN's complaint "be implemented." *Id.*, at A–17. Accord, *id.*, at A–31. That proposal, in marked contrast to the typically broad prayers for relief found in most complaints, limited the requested insert to the three matters described above, see *id.*, at A–78, and even provided a full illustrative insert as an exhibit, see *id.*, at A–85, A–86. Simply as a matter of construing a decision by a regulatory agency I find it difficult to understand the plurality's preference for discussing issues in their most abstract form. And as a matter of constitutional law there is surely no warrant for presuming that the Commission acted indiscriminately, insensitively, and without regard to the First Amendment questions raised by its access requirement. If any presumption is invoked, it should be that in favor of the regularity and constitutionality of governmental action, and the Commission's order should be construed narrowly as a consequence.

## II

I assume that the plurality would not object to a utility commission rule dictating the format of the bill, even as to required warnings and the type size of various provisos and

disclaimers.[3]  Such regulation is not too different from that applicable to credit card bills, loan forms, and media advertising.   See, *e. g.*, 15 U. S. C. §§ 1632(a), 1663; 12 CFR §§ 226.6–226.8, 226.10 (1985).[4]   I assume also the plurality would permit the Commission to require the utility to disseminate legal notices of public hearings and ratemaking proceedings written by it.   See *ante*, at 15–16, n. 12 (attempting to distinguish legal notices).[5]   These compelled statements

---

[3] Since 1919 the predecessor to the California Public Utilities Commission ordered that each electric bill reprint the regulations "regarding payment of bills, disputed bills and discontinuance of service."  *Pacific Gas & Electric Co.*, 17 Decisions of the Railroad Comm'n 143, 147 (1919).   Other States have similar requirements.

[4] "Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, *SEC* v. *Texas Gulf Sulphur Co.*, 401 F. 2d 833 (CA2 1968), cert. denied, 394 U. S. 976 (1969), corporate proxy statements, *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375 (1970), [and] the exchange of price and production information among competitors, *American Column & Lumber Co.* v. *United States*, 257 U. S. 377 (1921)."  *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978).

[5] At various times the Commission has required that inserts be placed in billing envelopes to "explai[n] the reasons behind [a] gas rate increase," *Pacific Gas & Electric Co.*, 9 P. U. C. 2d 82, 94 (1982), and to "describ[e] the components of the utility's costs," *San Diego Gas & Electric Co.*, 8 P. U. C. 2d 410 (1982).   See *Pacific Gas & Electric Co.*, 7 P. U. C. 2d 349, 518 (1981) ("By March 1, 1982, PG&E shall mail to all its customers a bill insert which describes the components of the utility's costs.   The complete bill insert to be sent is given in Appendix G of this decision.   Its size and form shall be approved by the Executive Director in writing prior to inclusion with any customer's bill").

California has also enacted legislation requiring that utilities notify their customers of rate increases.   These notices, which by statute must be included in utility bill envelopes, "shall state the amount of the proposed increase expressed in both dollar and percentage terms, a brief statement of the reasons the increase is required or sought, and the mailing address of the commission to which any customer inquiries relative to the proposed increase . . . may be directed."   Cal. Public Utilities Code Ann. § 454(a) (West 1975).   Other States likewise require certain service-related communications to be carried in a utility company's billing envelope.

differ little from mandating disclosure of information in the bill itself, as the plurality recognizes.[6]

Given that the Commission can require the utility to make certain statements and to carry the Commission's own messages to its customers, it seems but a small step to acknowledge that the Commission can also require the utility to act as the conduit for a public interest group's message that bears a close relationship to the purpose of the billing envelope.[7] An analog to this requirement appears in securities law: the Securities and Exchange Commission requires the incumbent board of directors to transmit proposals of dissident shareholders which it opposes.[8] Presumably the plurality does not doubt the constitutionality of the SEC's requirement

---

[6] See *ante,* at 18 (the result in *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), would not differ if the forced reply had appeared in a separate insert rather in the newspaper proper). See also *ante,* at 11, n. 7.

[7] Because TURN's purpose is to solicit funds to fight utility rate increases, the success of its appeal bears directly on the size of the bill which, after all, the billing envelope contains.

[8] 17 CFR § 240.14a–8 (1985). This regulation cannot be justified on the basis of the commercial character of the communication, because the Rule can and has been used to propagate purely political proposals. See, *e. g., Medical Committee for Human Rights* v. *SEC,* 139 U. S. App. D. C. 226, 229, 432 F. 2d 659, 662 (1970) (shareholder proposal to stop sale of napalm in part because of use in Vietnam), vacated as moot, 401 U. S. 973 (1971). See generally Weiss, Proxy Voting on Social Issues: A Growth Industry, Bus. and Soc'y Rev. 16 (Autumn 1974).

Even if the SEC Rule were justified largely on the basis of the commercial character of the communication, that justification is not irrelevant in this case. The messages that the utility disseminates in its newsletter are unquestionably intended to advance the corporation's commercial interests, and its objections to the public interest group's messages are based on their potentially adverse impact on the utility's ability to obtain rate increases. These commercial factors do not justify an abridgment of the utility's constitutionally protected right to communicate in *its* newsletter, but they do provide a legitimate and an adequate justification for the Commission's action in giving TURN access to the same audience that receives the utility's newsletter.

40

under the First Amendment, and yet—although the analogy is far from perfect—it performs the same function as the Commission's rule by making accessible the relevant audience, whether it be shareholders investing in the corporation or consumers served by the utility, to individuals or groups with demonstrable interests in reaching that audience for certain limited and approved purposes.

If the California Public Utilities Commission had taken over company buildings and vehicles for propaganda purposes, or even engaged in viewpoint discrimination among speakers desirous of sending messages via the billing envelope, I would be concerned. But nothing in this case presents problems even remotely resembling or portending the ones just mentioned. Although the plurality's holding may wisely forestall serious constitutional problems that are likely to arise in the future, I am not convinced that the order under review today has crossed the threshold of unconstitutionality. Accordingly, I respectfully dissent.