UNITED STATES of America,
Plaintiff–Appellee,

v.

Lawrence M. RICHEY,
Defendant–Appellant.

No. 88–3276.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 1990.

Decided Jan. 23, 1991.

Christopher Tait, Yakima, Wash., for defendant-appellant.

Carroll D. Gray, Asst. U.S. Atty., Spokane, Wash., for plaintiff-appellee.

Appeal from the United States District Court for the Eastern District of Washington.

Before WRIGHT, REINHARDT and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether prosecution and conviction of a former Internal Revenue Service employee, for willfully disclosing to the public information about a certain federal income tax return, violates his first amendment right to freedom of expression.

## I

Lawrence Richey was an Internal Revenue Service ("IRS") agent for approximately twenty-five years. In 1970, he audited Alan McDonald, who was then an attorney in private practice. After Richey examined McDonald's income tax returns for the years 1967–69, the IRS assessed $1,033.33 in additional taxes. McDonald paid the assessment.

After retiring from the IRS in 1981, Richey joined a private tax preparation service. He soon became involved in a tax shelter scheme and was indicted in 1985 for conspiracy to defraud the government and for aiding and assisting in the preparation of false and fraudulent tax returns.

Richey's case came to trial before a jury in 1987. Presiding as judge was the same Alan McDonald, who had become a United States District Judge for the Eastern District of Washington. Richey did not bring a motion to recuse Judge McDonald nor did Judge McDonald recuse himself. The jury found Richey guilty as charged.

Judge McDonald sentenced Richey to a term of probation. As a condition of probation, Judge McDonald enjoined Richey from making derogatory remarks about the United States government.

Richey's probation condition attracted local press attention. Bill Morlin, a reporter for the *Spokesman–Review* and *Spokane Chronicle* newspapers, called Richey and asked him why he thought Judge McDonald had imposed the controversial condition of probation upon him. Morlin would later testify that Richey responded with the following explanation: "Well, I'll tell you why. When I worked for the IRS I once audited Alan McDonald's taxes and further, that [*sic*] I found discrepancies in his tax returns." Morlin further testified that Richey said: "I kind of get the feeling that [Judge McDonald wanted] retribution." Morlin used Richey's statements in a news article, which was published on the front page of both the *Spokesman–Review* and the *Spokane Chronicle* on October 7, 1987.

On the same day that the newspaper article appeared, Richey spoke to two other people in the local press about his "retribution" theory. Robert Lowery, News Director for KBBO and KSRE radio stations in Yakima, Washington, testified that Richey stated, in an interview on October 7, 1987, that he had audited Judge McDonald. Rodney Lyle Smith of KNDO television in Yakima also testified that Richey stated that he had audited Judge McDonald some fifteen years earlier and assessed some additional taxes upon him.

On June 15, 1988, a federal grand jury filed a three-count indictment, charging Richey with willfully disclosing tax return information in violation of I.R.C. § 7213. Prior to trial, Richey filed a motion to dismiss the indictment on the grounds that, among other things, section 7213 violated his first amendment right to freedom of expression. Richey also filed a motion to remove the Assistant United States Attorney assigned to prosecute the case. The district court denied both motions. After a bench trial before Judge Hupp of the Central District of California, sitting by designation in the Eastern District of Washington, Richey was found guilty of violating section 7213.

Meanwhile, Richey appealed his earlier conviction for conspiracy to defraud the IRS and aiding and assisting in the preparation of false and fraudulent tax returns. Richey claimed, among other things, that the probation condition violated his first amendment right to free speech and that Judge McDonald had abused his discretion by not recusing himself *sua sponte*. This court concluded that the probation condition issue was moot by the time the case reached us because Richey had been resentenced to a new term of probation that did not include the condition. *See United States v. Richey*, 874 F.2d 817 (9th Cir. 1989) (memorandum disposition). We also determined that Judge McDonald did not abuse his discretion by not recusing himself *sua sponte* from Richey's case. *Id.*

Richey now appeals from his conviction for violation of section 7213. We have jurisdiction under 28 U.S.C. § 1291.

## II

Richey contends that the district court erred by denying his motion to dismiss the indictment because section 7213, as applied, violated his first amendment right to freedom of expression.

### A

The first amendment's guarantee of freedom of speech encompasses a broad spectrum of form and type of expression. While a "major purpose of [the] Amendment [is] to protect the free discussion of governmental affairs," *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966), the amendment also protects an individual's interest in self-expression. *See Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 534 n. 2, 100 S.Ct. 2326, 2331 n. 2, 65 L.Ed.2d 319 (1980). The fact that the majority of a community may find an idea politically, intellectually, or morally offensive does not shield the idea from first amendment protection. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 715, 97 S.Ct. 1428, 1435–36, 51 L.Ed.2d 752 (1977). Accordingly, we protect expression as diverse and unique as burning of the American flag, *see Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 2536, 105 L.Ed.2d 342 (1989), public announcement of boycott violators, *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909–10, 102 S.Ct. 3409, 3423–24, 73 L.Ed.2d 1215 (1982), and live entertainment including nude dancing, *see Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981).

However, first amendment rights are not without some constraints. The government may properly limit speech when compelling government interests outweigh the free expression interests of the speaker. *See, e.g., Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 841, 98 S.Ct. 1535, 1542, 56 L.Ed.2d 1 (1978). Our task, therefore, is to identify the relevant interests, and then to determine, under established first amendment principles, whether governmental interests outweigh those of the speaker in this case.

### B

#### 1

We discern three relevant interests in the present case. First, Richey has an undisputed interest in a fair trial, which includes the right to have an unbiased judge. *See Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) ("it certainly violates the Fourth Amendment, and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case"); *see also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972).[1] In *Lavoie*, a civil case, the Supreme Court concluded that Aetna's due process rights were violated when an Alabama Supreme Court justice participated in an appeal of an Aetna case while the justice had two lawsuits pending against other insurance companies, involving similar issues, at the same time. *See Lavoie*, 475 U.S. at 824–25, 106 S.Ct. at 1586–87. Here, in a criminal trial, Richey's due process interest was clearly substantial.[2]

---

**1.** In Richey's prior appeal, we concluded that Judge McDonald was not, in fact, biased. *See United States v. Richey*, 874 F.2d 817 (9th Cir. 1989) (memorandum disposition) ("In the conduct of the trial [Judge McDonald] was eminently fair."). However, since the events at issue in this appeal occurred prior to our resolution of the earlier appeal, we give Richey the benefit of any doubt and assume, for purposes of this appeal, that Richey had at least a colorable claim of potential bias by Judge McDonald.

**2.** Excluding its otherwise strident emotional rhetoric, the dissent asserts that Richey's interest in obtaining an unbiased judge has no place in a first amendment balancing process, but rather, should be considered only in relation to a due process or recusal statute violation. *Post* at 862 n. 6. Paradoxically, the dissent prays for a "narrow exception" to the commands of section 7213 to those who believe they are "victim[s] of judicial bias." *Post* at 871. Isolating such purported victims necessarily involves identifying members of the class.

2

Richey also has an interest, as a citizen, in commenting upon matters of public concern. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (quoting *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982)).

The potential bias of a judge is clearly a matter of public concern. *See Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 835–37, 98 S.Ct. 1535, 1539–40, 56 L.Ed.2d 1 (1978). There, the *Virginian Pilot,* a Landmark newspaper, published an article about a pending investigation of a state judge by the Virginia Judicial Inquiry and Review Commission. The article identified the state judge under investigation. Landmark was subsequently indicted, convicted, and fined for the article, as the identification of a judge under investigation was a violation of Virginia state law. The Supreme Court reversed the conviction. "Whatever differences may exist about interpretations of the First Amendment," the Court observed, "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Id.* at 838, 98 S.Ct. at 1541 (quoting

*Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966)). This includes the operation of the courts and judicial conduct of judges; indeed, such topics are "matters of utmost public concern." *Id.* at 839, 98 S.Ct. at 1541–42.[3] There can be no doubt that, in the case at hand, the public would be concerned about any potential judicial bias, and thus the topic was one in which Richey had a cognizable interest in discussing.

Richey also invokes the public's interest in being informed as a justification for his statements to the press. Indeed, "[b]y protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pacific Gas & Elec. Co. v. Public Utilities Comm'n,* 475 U.S. 1, 8, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986). The public's interest must indeed be considered in any first amendment calculus. This interest carries particular weight when invoked by the media or persons charged with informing the public. *See Landmark Communications,* 435 U.S. at 839, 98 S.Ct. at 1541–42 ("The operation of the Virginia Commission, no less than the operation of the judicial system itself, is a matter of public interest, necessarily engaging the attention of the news media."). Nevertheless, when invoked by persons privy to sensitive material as a result of their position, the public's interest in being informed carries far lesser weight in the balancing process. *Cf. id.* at

The consequences of removing the "due process" component from the first amendment calculus are drastic. Presumably, *any* person otherwise constrained by section 7213 would be free to disseminate—unchecked except for time, place, and manner restrictions—such information merely if the information creates inferences of judicial bias. Moreover, while judicial bias is indisputably a matter of great public concern, so is malfeasance by any public servant. So applied, the "narrow exception" becomes a gaping hole.

In any event, we have clearly identified the interest as one of "due process." Given that Richey's objectives in speaking to the press may have included an attempt to advance this interest, the government's reasons for limiting this speech must be shown to be all that more compelling in order to defeat such interest.

**3.** To the extent that Richey's statements simply involved Judge McDonald's audit, the statements cannot be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983). Private tax return information is not "a traditionally public source of information." *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17 (1984). Private tax return information is, moreover, not a matter upon which "free and open debate is vital to informed decision making by the electorate." *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736. However, the disclosure of tax information cannot be viewed in isolation; in context, the disclosure was merely the factual predicate for a larger proposition, that of the alleged bias of Judge McDonald.

837, 98 S.Ct. at 1540 (Court expressly disavowed taking a position on the constitutionality of an attempt by Virginia "to punish *participants* for breach of [the confidentiality] mandate") (emphasis added).[4]

### 3

The final interest at issue is that of the government and taxpayers in protecting the confidentiality of private tax information.[5] *See generally Church of Scientology v. IRS*, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987); *see also Johnson v. Sawyer*, 640 F.Supp. 1126, 1131 (S.D.Tex. 1986) (barring disclosure of information pertaining to deficiencies, penalties, and interest due); *Cliff v. Internal Revenue Serv.*, 496 F.Supp. 568, 571–72 (S.D.N.Y. 1980) (prohibiting disclosure of IRS memoranda that discuss the impact of IRS regulations on specific taxpayer liability). Richey concedes that the government has an interest in protecting the confidentiality of private tax information. However, since we are asked to balance competing interests, the magnitude of the interest must be carefully evaluated.

The government's interest in the confidentiality of tax information has two components. First, confidentiality is necessary to ensure compliance with federal tax laws. The American tax structure is unique in that it is based on a system of self-reporting. *United States v. Bisceglia*, 420 U.S. 141, 145, 95 S.Ct. 915, 918, 43 L.Ed.2d 88 (1975). "There is legal compulsion, to be sure, but basically the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability." *Id.* In enacting the statutory provisions guaranteeing confidentiality, including section 7213, Congress observed that "the question [has been raised] whether the public's reaction to this possible abuse of privacy would seriously impair the effectiveness of our country's very successful voluntary assessment system which is the mainstay of the Federal tax system." Sen.Rep. No. 94–938, Part I, *reprinted in* 1976 U.S.Code Cong. & Admin.News 3439, 3747.

The government also has an interest, asserted on behalf of its taxpayers, to ensure each individual taxpayer's right to privacy. A tax return and related information contains many intimate details about the taxpayer's personal and financial life. An individual's tax return will contain, in addition to the nature and source of income, information about the taxpayer's family, political affiliation, health data, and union membership. Likewise, a corporate tax return will contain detailed financial information which could potentially be abused by competitors. *See, e.g., Association of American Railroads*, 371 F.Supp. 114, 116 (D.D.C.1974) ("The policy of confidentiality for income tax data encourages the full disclosure of income by taxpayers in that the individual or corporate taxpayer is assured that his neighbor or competitor will not be apprised of the intimate details of his financial life."); *see generally* Benedict & Lupert, *Federal Income Tax Returns— The Tension Between Government Access and Confidentiality*, 64 Cornell L.Rev. 940, 943–47 (1979) (discussing the importance of maintaining the confidentiality of tax returns). Clearly, individual taxpayers desire to keep this information confidential.

### C

Our remaining task is to balance these competing interests. We begin by noting that we have previously found the government's interest in maintaining a workable tax system to be "compelling." *See Bradley v. United States*, 817 F.2d 1400, 1405 (9th Cir.1987). There, we considered Martin Bradley's first amendment challenge to I.R.C. § 6702, which forbids the filing of "frivolous" tax returns. Bradley submitted a Form 1040 to the IRS which contained *only* his name, address, social secur-

---

4. "Participants" was defined to include (1) members and staff of the Virginia Judicial Inquiry and Review Commission, and (2) witnesses or putative witnesses. 435 U.S. at 837 n. 10, 98 S.Ct. at 1541 n. 10.

5. Private tax information, as used in 26 U.S.C. § 7213, specifically includes tax deficiencies, over-assessments, and whether a taxpayer's return has been audited. 26 U.S.C. § 6103(b).

ity number, and a statement, printed in large letters, condemning the United States' involvement in Central America. Even though Bradley owed no taxes and was thus under no obligation to submit a tax return, the IRS imposed a $500 penalty upon Bradley for filing a frivolous tax return.

We rejected Bradley's first amendment challenge to the application of section 6702. *See id.* at 1404–05. After assuming for the sake of argument that Bradley's conduct contained "speech elements ... entitled to first amendment protection," we nonetheless observed that an "important government interest" could override Bradley's free expression rights. *Id.* at 1405. The "Government's *compelling* interest in maintaining a sound and administratively workable tax system" was just such an overriding interest. *Id.* (emphasis added).

■ In contrast to the government's "compelling" interest, Richey's personal interest in having an unbiased judge preside at his trial could hardly be advanced by his gratuitous remarks to the media, particularly given they were made *after* the trial. Although convicted and sentenced in the trial court, Richey still had an avenue for relief in the court of appeals. Conversely, the media offered no practical hope to Richey, as media commentary has no impact or, certainly, should have no impact, on judges as they reach their decisions. *See Bridges v. California*, 314 U.S. 252, 289, 62 S.Ct. 190, 206, 86 L.Ed. 192 (1941) (Frankfurter, J., dissenting) ("[judges] by tradition will not respond to public commentary"). Thus, while Richey's interest is concededly substantial, the relationship between the inter-

est and the statements at issue is, at best, tenuous.[6]

■ Richey's interest as a citizen in commenting upon matters of public concern is also substantial, but it must give way to the government's interest in this case. Even speech dealing with matters of public concern can be, in some instances, subject to governmental regulation. *Allen v. Scribner*, 812 F.2d 426, 432 (9th Cir.1987); *see also Cox v. Louisiana*, 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965). When the government has a legitimate interest in regulating speech, reasonable time, place, and manner restrictions are permissible. *See Allen*, 812 F.2d at 432. Here, the government seeks to restrict disclosure of private tax information to the press, where the result sought to be accomplished by such disclosure could be accomplished by less deleterious means. Given the compelling governmental interest in maintaining a workable tax system, it is difficult to say that this regulation is unreasonable. *See, e.g., Connick v. Myers*, 461 U.S. 138, 154, 103 S.Ct. 1684, 1694, 75 L.Ed.2d 708 (1983) (government employee's "limited First Amendment interest" was trumped by action which might "disrupt the office, undermine [supervisor's] authority, and destroy close working relationships"); *Snepp v. United States*, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 766 n. 3, 62 L.Ed.2d 704 (1980) (the government's "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign service" enabled the CIA to "impos[e] reasonable restrictions on employee activities that in other contexts

---

**6.** Ironically, Richey claims that he did not move to recuse Judge McDonald in part because he feared violating section 7213 by making such a motion. Certainly if section 7213 extends to revelations made in the course of a judicial proceeding, the section encompasses statements made outside of the courtroom.

The dissent suggests that we treat Richey's failure to move to recuse Judge McDonald as a bar to his first amendment claim. Of course, this failure to move for recusal cannot be a bar to Richey's claim; rather, it is merely a factor to consider in performing the balancing of interests where the first amendment is implicated.

In hindsight we know that Judge McDonald *did* recognize Richey as the IRS agent who audited him some seventeen years before. Nevertheless, without Richey's having moved for recusal—and thus establishing a factual predicate—his allegations of bias were even more speculative than they might at first appear. As the correlation between the matter of public concern (judicial bias) and the subject matter of the speech at issue (earlier tax audit) becomes more attenuated, the interest of the speaker diminishes in relation to the government's compelling interest.

might be protected by the First Amendment"). This is particularly true here where Richey failed even to attempt other less intrusive means of disclosing the sensitive information.[7]

In sum, there can be no doubt that Richey violated the duty of confidentiality imposed upon him by section 7213. Richey's self-serving comments to the press—made in full knowledge that they were in violation of section 7213—are not transmogrified into speech worthy of first amendment protection simply because they touched upon a matter of public concern. The district court did not err in denying the motion to dismiss the indictment on first amendment grounds.

### III

▮ Richey contends that the district court erred by not granting his motion for removal of the assistant United States Attorney. Richey's contention appears to be that the assistant United States Attorney might himself have violated section 7213 by disclosing in the indictment Judge McDonald's tax return information. Richey views such disclosure as a basis for removal of the assistant United States Attorney.

This argument is meritless. The record indicates that the disclosure in the indictment in this prosecution was made with Judge McDonald's consent. A taxpayer may disclose his own tax information. *See United States ex rel. Carthan v. Sheriff of New York*, 330 F.2d 100, 101 (2d Cir.), *cert. denied*, 379 U.S. 929, 85 S.Ct. 323, 13

L.Ed.2d 341 (1964); *see also* I.R.C. § 6103(a) (taxpayer not prohibited from disclosing his own tax return information). Moreover, tax information may be disclosed to a grand jury. *See Lampert*, 854 F.2d at 337 (tax information disclosed in an information); *In re Grand Jury Investigation*, 696 F.2d 449, 450–51 (6th Cir.1982).

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

Lawrence Richey's odyssey through the courts constitutes a sad chapter in this circuit's performance of its judicial duties. Twice now, we have severely stretched the limits of legal reasoning in order to avoid a serious issue regarding judicial conflict of interests. Twice now, significant violations of Richey's first amendment rights have occurred—each time with the active participation of the judiciary. While Richey's original complaints of actual judicial bias may well have been wholly without merit— and I think it reasonable to assume that they were—his allegations raise a serious question whether the district judge failed to recuse himself as required by 28 U.S.C. § 455 (1982). Moreover, the subsequent actions of this court have given rise to an even more serious question—whether the judiciary is willing to protect free speech when its own self-interest is involved. I should state at the outset that I do not believe that there is any judicial conspiracy to silence or punish Richey, or even any deliberate exercise of judicial ill-will toward

---

7. If Richey had revealed the audit in court, presumably the press could have discovered and reported the information from this source. That the information was otherwise discoverable is, however, irrelevant. In *United States v. Posey*, 864 F.2d 1487 (9th Cir.1989), the defendant, George Posey, was convicted of supplying nonclassified technical information to South Africa, in violation of the Comprehensive Anti–Apartheid Act, 22 U.S.C. § 5067, and the Arms Export Control Act, 22 U.S.C. § 2778 ("Acts"). Posey contended that because the information was readily available to virtually anyone in the world, the first amendment prohibited application of the Acts to dissemination of such information. We rejected this argument, holding that the government's national security interests permitted restriction of such information, even

if the information were otherwise readily discoverable. *See id.* at 1496–97. Similarly, in the present case, the government's interest in maintaining a workable tax system permits restrictions on disclosures even if the information might otherwise become known.

Moreover, public confidence in the tax system is less likely to erode if disclosure is made during the course of a judicial proceeding, rather than at the whim of a former IRS agent. Richey's offhand comments to the press suggest to the public that no restrictions of such information exist. *Cf. Lampert v. United States*, 854 F.2d 335, 338 (9th Cir.1988) ("once return information is lawfully disclosed in a judicial forum, its subsequent disclosure by press release does not violate the Act"), *cert. denied*, 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989).

him. There is, however, a remarkable judicial blindness—or perhaps a remarkable judicial insensitivity to the first amendment—that appears to stem from an inability to grasp the import of free speech when criticisms of the judiciary are involved.

## I.

The *Richey* saga undoubtedly originated with a district judge's determination to perform his duties fully and fairly and to carry out the obligations imposed on him by his oath of office. Nevertheless, that judge's decision to preside over Richey's first trial led, perhaps inevitably, to the constitutional controversy that today confronts us. As an I.R.S. agent, Richey audited the tax returns of an attorney named Alan McDonald and assessed additional taxes against him. Several years later, Richey, now in private business as a tax advisor, found himself the defendant in a criminal trial, with the same Alan McDonald, now a United States District Judge, presiding. Following Richey's conviction on charges involving the preparation of fraudulent tax returns, Judge McDonald sentenced him to a substantial term of imprisonment but suspended service of the sentence and placed him on probation for five years subject to a number of conditions. One of those conditions was the remarkable and patently unconstitutional requirement that Richey not make disparaging remarks about the United States government. Because of this unprecedented gag order, Richey faced the threat of criminal sanctions if he exercised his first amendment rights.

Some time after the imposition of the sentence, Bill Morlin, a reporter for the *Spokesman–Review* and the *Spokane Chronicle* newspapers, telephoned Richey to ask him about the prohibition against criticizing the government. Morlin identified himself and asked Richey why he believed Judge McDonald had imposed the obviously unconstitutional condition. According to Morlin, Richey responded that when he had worked for the I.R.S., he had

audited then-attorney McDonald's tax returns and found discrepancies in travel and entertainment expenses. He stated in response to a question that he did not remember the amounts involved. When asked again why he thought the judge had issued the unconstitutional gag order, Richey responded: "I kind of get the feeling that it was retribution; that he did remember; that he did remember the tax audit.... I think the judge thought, 'Now we've got this smart aleck.' He got me, all right."

Morlin published Richey's comments the next day. Based upon this article, Robert Lowery, the news director for the Yakima Broadcasting Company radio station, telephoned Richey and asked him to verify that he had audited Alan McDonald. Richey confirmed that he had conducted the audit but refused to say when or to reveal the outcome. Lowery broadcast this information twice on AM and twice on FM frequencies.

The same day, Rodney Smith, a reporter/editor for KNDO Television, initiated a videotaped interview with Richey concerning the gag order. Smith asked Richey why he thought Judge McDonald had imposed the restraint, and Richey responded: "I thought it was rather malicious. I may have rubbed him the wrong way in my frequent letters to the editors; I don't know. I also remember interviewing him as an agent about fifteen years ago and assessing some additional tax...." Two months later, Smith aired this tape on television.

For having responded to the press inquiries as he did, Richey was charged with three felony counts, and convicted on all three. He was sentenced to three years of supervised probation. He was also charged with having violated the terms of his original probation. His original probation was revoked and he was sentenced to a new probationary term; however the new order did not include a provision similar to the unconstitutional gag order.[1]

---

1. Judge McDonald's involvement with the case ended after the original trial and sentence.

Two other judges handled the subsequent proceedings.

## II.

Richey first appealed from his conviction on the original tax preparation charges and from the sentence of probation imposed by Judge McDonald. We affirmed. Strangely, we decided that our disposition was not worthy of publication. *See United States v. Richey,* 874 F.2d 817 (9th Cir.1989) (unpublished memorandum disposition). In our unpublished disposition, we rejected Richey's claim that Judge McDonald should have recused himself *sua sponte,* saying: "We are reluctant to lay down a rule that every judge in his circumstances is automatically disqualified from presiding." That analysis strikes me as exceedingly odd. One wonders how many judges such a rule would have affected. Is it really common, as our unpublished memorandum hints, for federal judges to preside over criminal trials of individuals who have previously been responsible for the assessment of tax delinquencies against them? I would hardly think so. More important, it seems evident that Judge McDonald did violate, perhaps unwittingly, the rule requiring a federal judge to recuse "himself in any proceeding in which his impartiality might reasonably be questioned." [2] While the prior relationship may not have actually affected Judge McDonald's attitude toward Richey, that is not the test under the statute. The test involves the "appearance" and not the actuality of bias. *See Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).[3] In addition, although we noted in our unpublished disposition that the gag order was an "odd provision" which was "not defensible," we held that Richey's appeal as to this condition was moot.

Today, this court has had a second opportunity to review Richey's treatment at the hands of the judiciary. This time we were asked to review the three felony convictions to which Richey was subjected for his statements explaining why he believed Judge McDonald was biased against him. Unfortunately, once again we have failed to engage in a reasoned discussion regarding either judicial conflicts of interest or the public's right to know. Instead, the majority wholly ignores the first subject and treats the second by a perfunctory balancing of interests followed with a conclusory holding that Richey's three felony convictions must be affirmed. The majority's determination that Richey had no first amendment right to speak as he did is especially ironic in light of the fact that the critical comments for which he was punished related to a federal court order that itself flagrantly violated his right to freedom of speech.

Richey does not dispute that his statements were in violation of the facial provisions of 26 U.S.C. § 7213. Rather, he challenges the constitutionality of that statute as applied to the speech in which he engaged. The majority holds that Richey was properly convicted because the first amendment does not protect the comments in which he criticized the conduct of the court. I dissent.

## III.

A public employee or former employee's free speech rights may be limited in ways that other persons' rights may not. Because Richey is a former employee of the I.R.S., we apply the two-part test of *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).[4]

**2.** 28 U.S.C. § 455 (1982) provides in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**3.** Whether, in light of Judge McDonald's failure to recuse himself, Richey would have been entitled to a reversal of his conviction is another matter. Richey's failure to make a "timely" motion would be a factor to be considered in

determining the legal consequences that would result from the court's violation of § 455(a). *Id.* at 868, 108 S.Ct. at 2206.

**4.** The majority purports to apply a general test under which "[t]he government may properly limit speech when compelling government interests outweigh the free expression interests of the speaker." However, this general rule is modified in the case of public employees "to accommodate the dual role of the public employer as a provider of public services and as a govern-

Under this test, the first question is whether Richey's speech was on a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983); *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734. The second question is whether Richey's interest in free speech outweighs the government's interest in protecting the privacy of tax return information. *See Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. This two-part balancing test involves a fact-specific inquiry. *See id.* at 150–51, 103 S.Ct. at 1692. The majority correctly concludes that Richey's speech was on a matter of public concern but erroneously holds that the government's interest in maintaining a workable tax system outweighs Richey's interest in communicating information regarding judicial misconduct. In my opinion, the latter holding constitutes serious constitutional error.

As the majority acknowledges, there can be little question that Richey's speech involved a matter of public concern. In reaching this conclusion, a court must examine the content, form, and context of the speech. *See Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. The content is undisputed: Richey revealed information pertaining to Judge McDonald's prior tax returns. In itself, this information would not ordinarily be of public concern. Nevertheless, in context, the speech was not *about* private tax information. Rather, it was about bias in the judiciary. The tax information was merely evidence to support the charge of bias. In short, although private tax information is not in itself a subject of public concern, the same is not true when the tax

information is relevant to the question whether a judge should have recused himself. There is a strong public interest in discussing the types of considerations that justify—or require—recusal, as well as in discussing the question whether a judge violated the recusal statute in a particular case. Indeed, "[t]he administration of justice by an impartial judiciary has been basic to our conception of freedom ever since Magna Carta. It is the concern not merely of the immediate litigants. Its assurance is everyone's concern...." *Bridges v. California,* 314 U.S. 252, 282, 62 S.Ct. 190, 203, 86 L.Ed. 192 (1941) (Frankfurter, J., dissenting). For this reason, "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 839, 98 S.Ct. 1535, 1541–42, 56 L.Ed.2d 1 (1978). The form of Richey's speech also supports a finding of public concern. Richey responded to inquiries from reporters, and the media generally found his comments worthy of dissemination. His statements were broadcast on television and radio and were printed in the newspaper. The interest that attached to Richey's comments supports the conclusion that he spoke on a matter of public importance.

While the answer to the public concern issue is self-evident, the next issue, the balancing of interests, requires more rigorous analysis. Two strong interests conflict. Richey had a compelling interest in speaking out on a matter of public concern.[5] On the other hand, it is undisputed

ment entity operating under the constraints of the First Amendment." *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). Thus, when the government attempts to restrict the speech of public employees, the proper analysis is first, whether the employee's speech was on a matter of public concern, and second, if it was, then whether the employee's interest in making the statement outweighs the government's interest as an employer in promoting the efficiency of its public services. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

Although my colleagues fail to discuss specifically the distinction between the general test and the test applied to public employees, I note that they correctly cite *Pickering,* mention Rich-

ey's status as a public employee, and hold that Richey's speech was on a matter of public concern. Only then do they balance Richey's interest in speech against the government's interest in promoting the efficiency of tax collection. Because they end up properly applying the two-part *Pickering* test, any purported application of the general law is of no consequence in this case.

5. To determine the strength of Richey's interest, a court must again look to the content, form, and context of his speech. *See Connick,* 461 U.S. at 150–52, 103 S.Ct. at 1692–93. The Supreme Court has stated that the balancing of interests requires an examination of the "manner, time, and place" of the speech. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891,

that the government has a weighty interest in protecting the privacy of tax return information. *See Lampert v. United States,* 854 F.2d 335 (9th Cir.1988), *cert. denied,* 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989). In order to foster public confidence in the privacy of individual returns, Congress prohibited government employees and former employees from disclosing information relating to them. *See Stokwitz v. United States,* 831 F.2d 893, 894 (9th Cir.1987), *cert. denied,* 485 U.S. 1033, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988). The statute specifically sought to end the I.R.S.'s practice of serving as a "lending library" to other government agencies. *Id.* (quoting 122 Cong. Rec. 24,013 (1976) (remarks of Sen. Weiker)). The Supreme Court has emphasized the statute's "primary purpose of limiting access to tax filings." *Church of Scientology v. IRS,* 484 U.S. 9, 16, 108 S.Ct. 271, 275, 98 L.Ed.2d 228 (1987). Thus, in order to resolve whether Richey's comments were protected speech, we must determine which of these competing interests weighs most heavily.[6]

### IV.

The majority initially denigrates the strength of Richey's free speech interest in three ways. First, my colleagues minimize the importance of the public's interest in being informed. Second, they state that

2898, 97 L.Ed.2d 315 (1987); *Connick,* 461 U.S. at 152, 103 S.Ct. at 1693. Despite the variation in the Court's language, the considerations that must be weighed when balancing the interests are essentially the same as those involved in determining whether the statement relates to a matter of public concern. It would make no sense to ignore the content of the speech or the strength of the public's interest in it when performing the balancing function. Moreover, a time, place, and manner inquiry cannot be separated from a form and context examination.

The time, manner, and place of the communication may serve to support or detract from the free speech side of the argument. In the case before us, had Richey made his statements regarding Judge McDonald's tax returns to an individual engaged in a civil dispute with the judge rather than to the press, and had those statements been made during the course of a cocktail party, the balancing of the interests might well justify the result the majority reaches. However, those are hardly the circumstances with which we are faced.

Richey failed to exhaust his "avenue for relief in the court of appeals." Finally, they suggest that Richey's failure to move to recuse Judge McDonald significantly undermines his claim. All of these arguments are based on erroneous assumptions. None has any bearing on the proper outcome of this case.

The claim that the public's interest in being informed is of less importance "when invoked by persons privy to sensitive material as a result of their position" finds no support in the law, as evidenced by the majority's exclusive reliance on an opinion that expressly declined to address this issue. *See Ante* at 860-61 (citing *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 837, 98 S.Ct. 1535, 1540-41, 56 L.Ed.2d 1 (1978)). To the contrary, the public has a weighty first amendment interest in hearing whistleblowers speak out when their communication exposes government corruption. *See Brockell v. Norton,* 732 F.2d 664, 668 (8th Cir.1984). It should be self-evident that the public's interest in learning of governmental wrongdoing depends only on the nature of the information, not the occupation of the source. In weighing the public interest in the *Pickering* balance, we have always asked whether the *"subject* was 'a matter of legitimate public concern.'" *Connick,* 461 U.S. at

6. The majority suggests that there is a third interest to be weighed—Richey's interest in obtaining an unbiased judge. The majority then quickly concludes that this interest is insufficient given the other circumstances of the case. I fail to understand why the majority raises this issue at all, let alone as a part of its first amendment balancing process. Clearly, the only method of obtaining a new judge is through judicial procedures, and it is quite evident from the record that Richey's statements to the press were made for different reasons. More important, Richey's interest in *obtaining* a fair trial, as opposed to his interest in publicizing the facts relating to his allegedly unfair treatment, is not a factor to be considered when performing our first amendment balancing function. It is only Richey's interest in speech—and the public's right to know—that may be weighed against the government's interest in silencing him. Richey's interest in obtaining a fair trial is more appropriately considered in relation to a claim that he was deprived of his due process rights or that the recusal statute was violated.

145, 103 S.Ct. at 1689 (quoting *Pickering*, 391 U.S. at 571–72, 88 S.Ct. at 1736) (emphasis added). We consider the speech, not the speaker. Thus, the majority errs by understating the importance of the public's right to know.[7]

The majority's claim that Richey should have exhausted his judicial remedies is equally without merit. A reversal in the court of appeals would not have accomplished Richey's goal of informing the public ·about the existence of judicial bias. People have a first amendment right to criticize the judiciary when they believe a wrong has occurred. There is no obligation to delay speaking out in hopes that the judicial system will itself ultimately recognize a wrong and may even take action to correct it—someday. Courts are not above the law—or above criticism. Moreover, even if it is ultimately determined that there has been no judicial misconduct, what matters for purposes of the first amendment is not whether the criticism is correct; what matters is that a person who believes that an injustice has been done has a right to say so publicly. The first amendment right to speak does not evaporate merely because a criticism may be factually or legally in error. The

right to appellate review is simply irrelevant to the exercise of the first amendment right to criticize the district court.

The majority's final point is that Richey should have moved to recuse Judge McDonald. That he did not do so, however, is of no legal significance for first amendment purposes.[8] Under the statute, it is the duty of the judge to recuse himself whether or not a challenge is made.[9] Two legal issues were raised by Richey's criticisms: first, whether, by presiding over his case, Judge McDonald violated the applicable rules and thus acted improperly, and second, whether the judge's conduct, even if it was not covered by a rule, was unfair and prejudicial. Either way, Richey had a compelling interest in bringing his complaint of shortcomings in the judiciary to the public's attention. If the recusal law covered the circumstance of Richey's trial before Judge McDonald, Richey had a strong interest in communicating the fact of Judge McDonald's failure to recuse himself. If, on the other hand, judges are not presently required to recuse themselves in cases in which defendants have previously imposed financial penalties on them, Richey may have had an even more compelling

---

7. Of course, the fact that the public's right to know is being asserted by a former I.R.S. employee rather than the news media is not irrelevant to the balance that must be struck here. That fact is relevant to the weight of the governmental interest that we must balance against the public's interest. As already noted, the government may have a legitimate interest in regulating public employee speech under circumstances in which it could not prohibit the media from speaking. However, it is surely incorrect to say, as the majority does, that because Richey is a former government employee rather than a representative of the news media, the public's interest in the content of his speech is in any way diminished. To do so results in double-counting of the government's interest: the majority uses it once to reduce the weight of the public interest and again to increase the countervailing weight of the governmental interest. Neither logic nor precedent supports this improper loading of the scales.

8. As pointed out *supra* note 3, the only relevance of Richey's failure to file a recusal motion · is with respect to the remedy to be imposed for a recusal violation, not with respect to whether a violation occurred.

9. A judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455 (1982). It is not necessary that the judge be conscious of the circumstances creating an appearance of partiality for the recusal statute to apply. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). As long as the public could reasonably believe that the judge is aware of these circumstances, the statute is applicable. *Id.* Here, the coincidence that Richey had previously audited Judge McDonald would certainly appear to have been enough to allow reasonable persons to question the judge's impartiality. Moreover, although actual knowledge is not required, Judge McDonald's deposition strongly suggests that, when Richey appeared before him as a criminal defendant, he was aware that Richey had conducted an audit of his tax returns. In any event, that we subsequently failed to overturn Judge McDonald's action because of a reluctance to adopt a general rule disqualifying all judges in similar circumstances does not affect the fact that Richey spoke out publicly on a matter of overwhelming public importance.

justification for "going public" with a case for reform of the current rules.

The majority's erroneous denigration of the strength of Richey's free speech interest skews the balance in favor of the government. Richey's interest in communicating on a matter of serious public concern cannot be so lightly dismissed.[10]

## V.

The balancing of interests in which my colleagues engage can perhaps most generously be characterized as skimpy and confused. The majority refers to time, place, and manner restrictions, thereby suggesting that Richey could have made the statements for which he was convicted in a different time, place, or manner. It of course does not identify the time, place, or manner "regulation" it purports to uphold, nor does it identify when, where, or how Richey could have spoken. The plain fact is, of course, that there is no time, place, or manner regulation—solely a content proscription. Further my colleagues state that Richey's disclosure to the press could have been "accomplished by less deleteri-

ous means," but they shed little light on the means of which they might approve. Given their earlier comments that Richey could have moved for recusal or exhausted his judicial remedies in the court of appeals, one might think that they would permit him to make his disclosure in court. Yet, they carefully refrain from asserting that Richey would be protected against a criminal prosecution if he had chosen a judicial forum in which to raise his complaints initially.[11] Most important, even if choosing a judicial forum might facilitate reversal of Judge McDonald's rulings, *but see United States v. Richey*, 874 F.2d 817 (9th Cir.1989) (unpublished memorandum disposition), doing so would not as directly or as effectively fulfill the function of informing the public. The remedies simply do not serve the same purpose and are not mutually exclusive.

As my colleagues recognize, once Richey made a disclosure in court, the press would be free to disseminate the information, *see Lampert v. United States*, 854 F.2d 335, 338 (9th Cir.1988), *cert. denied*, 490 U.S. 1034, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989)

10. The majority cites four cases as justification for its balancing of the interests in favor of suppressing Richey's speech. None of the cases remotely supports the majority's conclusion. *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), involved one statute that was unconstitutionally broad and another that was an unconstitutional time, place, and manner restriction on free speech. *Allen v. Scribner*, 812 F.2d 426 (9th Cir.1987), reversed a grant of summary judgment for the defendants, holding that a public employer cannot limit an employee's speech based on a bare assertion that the speech would interfere with efficient governmental operations. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), involved statements made on a questionnaire that a public employee distributed to her co-workers; the Court upheld a limitation on the employee's free speech rights because the statements were of only limited public concern and were reasonably likely to disrupt the office. Finally, *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), involved national security concerns. The only relevance of the cited cases is that they support the undisputed proposition that public employee speech may be limited under some circumstances. *See supra* part III. The cases may provide an introduction to the general issues involved but they are of little assistance in resolving the specific question before us.

11. The majority leaves open the question whether § 7213 extends to disclosures made in the course of judicial proceedings. In my view, there is no question that as a part of his appeal from his original conviction Richey was entitled to place on the public record the facts supporting his claim that Judge McDonald erred in failing to recuse himself *sua sponte*. There exists a great need for public accountability in criminal proceedings, as openness "discourage[s] ... decisions based on secret bias or partiality." *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814, 2823, 65 L.Ed.2d 973 (1980). Open judicial proceedings also have "a significant community therapeutic value." *Id.* at 570, 100 S.Ct. at 2824. These aspects of open justice are particularly important when courts consider issues of recusal, where allegations of bias have been raised, and especially so when recusal issues arise in the context of a criminal trial. "To work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' and the appearance of justice can best be provided by allowing people to observe it." *Id.* at 571–72, 100 S.Ct. at 2824 (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)).

—although, as noted, according to the majority Richey might be subject to criminal prosecution for that disclosure. However, Richey's reason for speaking to the press was to inform the public of his allegations of judicial bias. No logical or legal reason exists that he should be required to file papers in court and await the possibility that some enterprising journalist will discover the conflict and decide independently to publicize it.[12] Richey's first amendment interest is in his *own* speech; that the media might discover the conflict following a disclosure in court filings and communicate it to the public does not diminish Richey's right to speak to the press and public directly. Disturbingly, my colleagues seem to suggest that because Richey's comments were newsworthy and the courthouse press might have picked them up, his interest in direct communication was less deserving of protection. This conclusion makes no sense.

## VI.

The majority is absolutely correct that the government's interest in maintaining a workable tax system is "compelling." *See Bradley v. United States*, 817 F.2d 1400, 1405 (9th Cir.1987).[13] Confidentiality of tax return information is a critical component of a tax system based on self-report-

ing of income. *See United States v. Bisceglia*, 420 U.S. 141, 145, 95 S.Ct. 915, 918, 43 L.Ed.2d 88 (1975). But this only serves to establish the validity of the statute in general. It does not tell us when an exception is or is not warranted in order to preserve constitutional principles. Here, we are faced with a specific factual situation and asked to make an extremely narrow exception to the statute. There is no reason to think that the narrow exception Richey seeks would jeopardize the entire tax system or result in wholesale disclosure of citizens' tax returns. While we must remain aware of the importance of the government's general interest in nondisclosure and proceed cautiously, where countervailing first amendment interests exist the Constitution obligates us to look carefully at the particular harm to the individual involved as well as the general harm to first amendment values that would result from suppression of the specific speech at issue.

Richey's limited disclosure of tax return information was the means by which he raised an important question regarding judicial bias—a subject that "lies near the core of the First Amendment." *Landmark Communications*, 435 U.S. at 838, 98 S.Ct. at 1541. Moreover, it was the taxpayer whose conduct, albeit well-intentioned, precipitated the disclosure. Judge

12. My colleagues state that "public confidence in the tax system is less likely to erode if disclosure is made during the course of a judicial proceeding, rather than at the whim of a former IRS agent." This statement reveals the weighted scales with which they balance the competing interests in this case. The balancing here is not about permitting the destruction of the entire tax reporting system in order to appease the "whims" of a former I.R.S. agent. Rather, it is about whether the unquestionably important governmental interest in promoting a workable tax system would be unduly compromised by a narrow exception permitting disclosure of limited tax information when such information is directly relevant to allegations of judicial bias.

13. Although I agree with this principle, the majority attaches far too much significance to *Bradley*. *Bradley* involved the failure of a person who had submitted a tax return to provide the required information on that return, in vio-

lation of a statute. We held that the statute did not violate the first amendment "because it penalizes a taxpayer's *conduct* of filing a return based on a frivolous position, not the *expression* of views." *Bradley*, 817 F.2d at 1405 (emphasis in original). We then went on in dicta to balance the government's interest in maintaining the tax system against Bradley's purported first amendment interest. We found that the government's interest in the filing of accurate tax returns outweighed Bradley's interest in asserting a frivolous position as a justification for his failure to pay taxes. The balancing that we did in that case was a far different matter than the balancing that we do here. In the case before us, we weigh the public's interest in learning of judicial bias against the injury to the system that could result from disclosure that a judge had once been assessed a delinquency. By relying so heavily on *Bradley*, the majority significantly overstates the government's interest and improperly trivializes Richey's free speech rights.

McDonald presided over a criminal trial of an individual who had previously assessed tax delinquencies against him, and he imposed a wholly unprecedented and unconstitutional gag order upon that individual. Thus, Richey's disclosure was provoked, and not gratuitous. Further, it was appropriately limited in scope. His responses to press inquiries communicated his belief that Judge McDonald had violated the recusal laws by presiding over his trial. By supporting his claim with specific facts, Richey was able to bring to the public's attention the information necessary to an evaluation of his allegation of judicial misconduct. As the courts have recognized in the context of libel, "The protection of the public requires not merely discussion, but information." *New York Times Co. v. Sullivan,* 376 U.S. 254, 272, 84 S.Ct. 710, 721–22, 11 L.Ed.2d 686 (1964) (quoting *Sweeney v. Patterson,* 128 F.2d 457, 458 (D.C.Cir.), *cert. denied,* 317 U.S. 678, 63 S.Ct. 160, 87 L.Ed. 544 (1942)). Richey therefore had a strong interest in being able to bring the relevant facts to the public's attention.

In this case, the harm that resulted from disclosure was not great. Judges have life tenure and can readily shrug off unpleasant publicity. Moreover, little or no hard tax information was actually revealed. All that was disclosed was that Judge McDonald had failed to calculate the amount due properly and had been assessed an additional sum. No confidential information regarding business or personal transactions was made public. The information related primarily to governmental enforcement action rather than to the content of the taxpayer's return.[14] The purpose of Richey's disclosure was not to demonstrate that Judge McDonald had done something wrong with respect to the payment of his taxes but rather to show that the judge had a conflict of interest regarding a case over which he had presided. Further, identical disclosure could lawfully have been, and in

fact was, made shortly afterwards in material filed with this court. Subsequently, the facts were discussed in a disposition we issued. Thus, the only harm was that a small amount of tax related information was disclosed prematurely. The government's general interest in prohibiting disclosure of the contents of tax returns was breached to only the slightest degree.

After all the factors are analyzed, three considerations appear preeminent. First, bias on the bench is a matter involving a breach of public trust. Second, an individual who believes he is the victim of judicial bias should not be silenced by the state. Third, the disclosure of confidential tax information was minimal in nature. In light of all of the circumstances of the case before us, I have little difficulty in concluding that under the *Pickering* balancing test, Richey's free speech rights are paramount.

I would hold that, given the narrow exception we are asked to make, Richey's specific first amendment interest and that of the public clearly outweigh the government's general interest in protecting the operation of its tax reporting system. Accordingly, I would find the statute unconstitutional as applied to Richey and reverse his three felony convictions.

**14.** The disclosure was, in fact, minimal compared to the disclosure that judges are required to make under the Ethics Reform Act of 1989, 2

U.S.C. § 701 *et seq.* (requiring judges to file forms disclosing income and assets and provid-

ing the public with a right to obtain copies of such disclosure documents).